FRANCES W. BOWEN, PLAINTIFF-RESPONDENT, v. JAMES H. BOWEN, DEFENDANT-APPELLANT.

Argued December 12, 1983—Decided April 16, 1984.

38

*Gary N. Skoloff* argued the cause for appellant (*Skoloff & Wolfe,* attorneys; *Francis W. Donahue,* on the briefs).

*Henry E. Rzemieniewski* argued the cause for respondent.

The opinion of the Court was delivered by

O'HERN, J.

This case concerns the valuation and equitable distribution of a spouse's minority stock interest in a closely held corporation. The specific question is whether a court, in effecting distribution of the assets, and faced with difficulty .in fixing value, should permit the stockholder husband to retain ownership of all of the stock and award the wife an equitable one-half interest in the stock. We hold that a court should not and reverse the judgment below.

The parties were married in 1955 and had four children. At the time of trial, three children were emancipated and an 18-year-old son was beginning college. During the early years of the marriage, the plaintiff worked and helped to put defendant through engineering school. After graduation, defendant worked for Union Carbide until 1971, when he left to take a position with a small manufacturing corporation. In 1973, he and two other employees of that company formed the Polycel Corporation, of which he is now a 22% shareholder. He became a full-time employee of Polycel in 1976. Polycel is engaged in plastics manufacturing and is located in a rented factory in Bound Brook. In 1979, its gross sales were over $3,000,000 and its net income was $144,235.

The parties separated in March 1979. The plaintiff continued to live in the family home. At the time of trial she was employed as a secretary. The major assets of the parties were the family home in Hillsborough and the 22% interest in Polycel.

In view of the length of the marriage and the contributions of both, the court directed that the marital assets be divided equally between husband and wife. The family home was to be sold as soon as possible, and after payment of the expenses of sale, previously incurred college debts, and certain other debts, the net proceeds were to be divided equally.

Concerning the equitable distribution of the defendant's 22% interest in Polycel Corporation, the court, confronted with testimony valuing the stock anywhere from a minimum value of $70,854 to a maximum of $338,279, concluded that determining the fair market value of the stock solely from the valuations made by the accountants would be nothing more than conjecture. It ordered what it recognized to be "an entirely new and more practical scheme of distribution." It directed that the defendant retain all of the stock, but that the plaintiff be awarded an "equitable one-half interest in said stock." Defendant was to retain all indicia of ownership, including the right to vote at shareholders' meetings, but he was to share with the

plaintiff all dividends and proceeds from the sale or transfer of any stock.

To prevent avoidance of dividends by payment of excessive salaries, bonuses, or fringe benefits, the court fixed the then current amount of these items, $48,000 per year, as base compensation to the defendant and ordered that all future income in excess thereof be deemed stock dividends to be divided between the parties. The court ordered that one-half of the gross amount of such dividends was to be paid by the husband to the plaintiff with each to pay his or her own taxes. The judgment also required defendant to report annually to plaintiff the total of all benefits and expenses received by him and paid for by Polycel that might be used for both business and personal reasons. These were presumed to be 40% attributable to business with the balance regarded as a dividend. The other officers and directors were to be informed of the judgment and notified that they would be personally responsible to the plaintiff for any losses she might sustain as a result of a sham agreement between the parties disposing of the husband's interest.

The judgment also provided rehabilitative alimony in the amount of $300 per month for three years, $700 per month permanent alimony, and $200 per month child support.

In an unreported decision, the Appellate Division affirmed the judgment on the basis of the trial court's opinion. We granted the defendant's petition for certification. 94 *N.J.* 548 (1983).

The dispute here is not over the general principles applicable to such cases. The trial court recognized the controlling principles of *Borodinsky v. Borodinsky,* 162 *N.J.Super.* 437 (App.Div. 1978), which bear restating here:

> It seems almost doctrinal that the elimination of the source of strife and friction is to be sought by the judge in devising the scheme of distribution, and the financial affairs of the parties should be separated as far as possible. If the parties cannot get along as husband and wife, it is not likely they will get along as business partners. [*Id.* at 443.]

In *Borodinsky,* the issue was the value of an auto repair business, Belmont Brake, which was wholly owned by the husband. The divorce judgment awarded the wife a 50% interest in the stock of Belmont Brake. The trial court arrived at the conclusion to distribute the stock in kind since it could not put a value on the business. In the court's opinion, "the witnesses, including accountants, could not or did not supply sufficient information so that the judge's determination as to value would constitute more than conjecture." *Id.* at 442. The husband argued that the disposition would inexorably lead to a corporate deadlock with the possibility of dissolution and forced liquidation. The Appellate Division found the method of distribution arbitrary and capricious in light of the situation of the parties and the distribution techniques that were available in order to achieve a reasonable result.

The difference between *Borodinsky* and this case is that here the husband retained the same role in the close corporation as he had before. There would be no occasion for deadlock or forced liquidation or dissolution.[1] He would continue to be a successful wage earner. The result proposed by the court is not without its interesting aspects. Nonetheless, in our view, the disadvantages of the continuing relationship between the parties outweigh the problems of proof that confront a court in such a situation.

The restrictions may inhibit the corporation's ability to conduct its affairs without judicial supervision. In reality the husband would become an 11% owner. Although there would be no occasion for deadlock, the court has created a new interest in the corporation, something the other shareholders did not want, as evidenced by their buy-sell agreement. Limiting the husband's future earnings makes earning potential a separate ele-

---

[1]We note that it is not inappropriate to distribute stock in kind when there are no issues of corporate control. That solution will rarely, if ever, be applicable in a close corporation situation.

ment of the equitable distribution, a concept we disapproved in *Mahoney v. Mahoney,* 91 *N.J.* 488 (1982). Treating certain business expenses as a dividend poses additional income tax problems for the parties. Furthermore, the other two owners may be placed in an unfair situation since defendant's compensation and expenses will have to be monitored and they may be personally liable if they seek to disentangle themselves from him.

Each of these problems poses a potential "source of strife and friction" that should be eliminated. *Borodinsky,* 162 *N.J. Super.* at 443. We hold that a court faced with what it considers inadequate proofs of value must nonetheless eliminate the sources of continuing disquiet between the parties. It must therefore resolve the question of value in the divorce proceedings. If need be, it can marshall additional proofs to enable it to fix a value for the disputed asset.

We have recently had occasion to review again the principles that shall guide courts in fixing the value of business enterprises. *Dugan v. Dugan,* 92 *N.J.* 423 (1983). In that case, the issue was the calculation of goodwill attributable to a professional legal corporation. We recognized that

> [t]here are probably few assets whose valuation imposes as difficult, intricate and sophisticated a task as interests in close corporations. They cannot be realistically evaluated by a simplistic approach which is based solely on book value, which fails to deal with the realities of the good will concept, which does not consider investment value of a business in terms of actual profit, and which does not deal with the question of discounting the value of a minority interest. [92 *N.J.* 432 (quoting Judge Pressler in *Lavene v. Lavene,* 148 *N.J.Super.* 267, 275 (App.Div.), certif. den., 75 *N.J.* 28 (1977)).]

In this case each of these issues was present. Generally speaking, we have held there is no essential difference so far as equitable distribution principles are concerned between an interest in an individual business and one held in corporate name: "The form should not control." *Dugan,* 92 *N.J.* at 431–32 (quoting *Scherzer v. Scherzer,* 136 *N.J.Super.* 397, 400 (App.Div. 1975), certif. den., 69 *N.J.* 391 (1976)).

There is no single formula that will apply to each enterprise: "Each case presents a unique factual question, the solution to which is not within the ambit of any exact science. The reasonableness of any valuation depends upon the judgment and experience of the appraiser and the completeness of the information upon which his conclusions are based." *Lavene v. Lavene*, 162 *N.J.Super.* 187, 193 (Ch.Div.1978) (on remand from 148 *N.J.Super.* 267).

In arriving at a federal estate or gift tax value for close corporation stock, "[n]o general formula may be given that is applicable to the many different valuation situations." Rev.Rul. 59–60, 1959–1 C.B. 237. Nevertheless, most experts and courts have used the IRS's Revenue Ruling 59–60 as the guide in valuing the close corporation. The goal is to arrive at a fair market value for a stock for which there is no market. To do this, the IRS recommends that "all available financial data, as well as all relevant factors affecting the fair market value, should be considered." *Id.* at § 4.01.

Among the factors listed in the Ruling as "fundamental and requir[ing] careful analysis" are the history of the firm, the nature of the company, the outlook for the industry, the book value of the stock, the size of the block to be valued, the earning and dividend-paying capacities of the company, and the existence of goodwill or other intangible assets. *Id.* Generally, greater weight will be given to earnings factors for those companies that sell products or services, and to asset values for investment or holding companies. *Id.* at § 5. In addition, earnings factors must be capitalized. Choosing the appropriate capitalization rate is "one of the most difficult problems in valuation." *Id.* at § 6. Among the considerations that go into a capitalization rate are the nature of the business, the risk involved, and the stability of earnings. *Id.*

The Ruling warns against an inflexible approach to valuing. Methods such as taking an average of several factors are disapproved. *Id.* at § 7. However, restrictive arrangements, such as

buy-sell agreements, may be used, along with other factors, to arrive at the value of the stock. *Id.* at § 8. Since the three Polycel shareholders have made their interest subject to a buy-sell agreement, we first consider its application to this case.[2]

(a) *Buy-Sell Agreement*

Ordinarily the value that people put on an asset is the most productive place to start such an inquiry: "It would be short-sighted and unwise for courts to reject out of hand consensual solutions to vexatious personal martimonial problems that have been advanced by the parties themselves." *Petersen v. Petersen,* 85 *N.J.* 638, 645 (1981) (enforceability of automatic escalation clause in marital settlement).

*Stern v. Stern,* 66 *N.J.* 340, 345 (1975), recognized that placing "a precise or even an approximately accurate value upon an interest in a professional partnership, when the partner whose interest is in question intends to continue as a member of the firm is no easy matter." In that case, the Court considered the most accurate and certainly the most useful method for purposes of equitable distribution to be the formula for the calculation and payment of a partner's interest to his personal representative upon death. *Id.* at 346. But the circumstances were different from those presented to the court here. The evidence in *Stern* was that the formula was revised quarterly, was obviously intended to reflect the elements of the enterprise's worth, other than the individual's capital account, and that the

---

[2]We have discussed Revenue Ruling 59–60 because it is commonly employed, and its principles were used in the trial below. We recognize, however, that there are other acceptable methods of valuation, *see, e.g., Righter v. United States,* 439 *F.2d* 1204, 194 *Ct.Cl.* 400 (1971) (comparative appraisal technique), and we make no judgment as to what method the court should use on remand. *See* Note, *The Effect of Corporate Control on Valuation of Closely Held Corporate Stock for Federal Estate and Gift Tax Purposes,* 1982 *U.Ill.L.Rev.* 775; Schreier and Joy, *Judicial Valuation of "Close" Corporation Stock:* Alice in Wonderland *Revisited,* 31 *Okla.L.Rev.* 853 (1978).

payments occasioned by death were to be funded with the proceeds of life insurance on the lives of the several partners. *Id.* The *Stern* Court held that a trial court would be justified in adding to this sum the value of defendant's capital account, treating the total as the presumptive value of the defendant's partnership interest in the firm. *Id.* Once it is established that the books of the firm are well kept and that the value of the partners' interests are in fact periodically and carefully reviewed, then the presumption would be subject to attack only upon the submission of clear and convincing proofs. *Id.* at 346–47.

Those elements were not present here. The buy-sell agreement among the three stockholders prohibited a transfer of the stock unless offered to the other stockholders or the corporation at a price computed in the agreement. The agreement provided that each partner's share would be determined on the basis of book value, provided that the minimum value of defendant's interest was $25,000. It provided that book value was to be established by the corporation's accountant. In the event of disagreement with a shareholder's accountant, "then a Certified Public Accountant shall be appointed by the presiding judge of the Somerset County Court * * * [who] shall determine the book value of the shares of corporate stock in accordance with this formula and the determination by said Accountant shall be binding upon all parties to this Agreement." The formula established by the agreement specifically excluded goodwill or other intangible assets but otherwise specified how accounts receivable, inventory, machinery, fixtures, taxes, and life insurance policies were to be valued. In addition, the agreement provided for installment payments over a period of years with stated interest. The agreement also provided that the parties would periodically fix a value in a Certificate of Agreed Value. No Certificate existed here.

We agree with the trial court's conclusion that this buy-sell should not control because it did not contemplate the

circumstances when the stockholder's status with the corporation and his fellow stockholders was to remain the same. Under these circumstances, Polycel's assets of goodwill and other intangibles (including considerable technical expertise) should have been included to reflect fair value. We note that the procedure endorsed in *Stern*—adding to the base value set by the partnership agreement the value of the capital account that was outside the agreement, 66 *N.J.* at 346—might be used when a corporate buy-sell is similarly trustworthy but incomplete. The addition of goodwill calculated in accordance with the guidelines of *Dugan v. Dugan,* 92 *N.J.* 423 (1983), would yield presumptive evidence of value. Determination of an appropriate capitalization rate would be based upon rates of return in comparable publicly traded securities, or on sales of comparable businesses. *See infra,* at 51.

█ Here, neither party sought to rely upon the buy-sell agreement, although the defendant's expert testified that he had recently calculated the value on that basis at $92,473. The effect of a buy-sell agreement in a matrimonial settlement cannot be regarded as facially dispositive, but must be considered in light of all of the circumstances and its provisions. *See* Rev.Rul. 59–60, at § 8. A central inquiry is whether it represents an arm's length agreement to fix real value for the triggering event that has occurred. *See Hughes v. Sego Int'l Ltd.,* 192 *N.J.Super.* 60 (App.Div.1983) (buy-sell agreement not controlling in forced liquidation since parties contemplated only death or voluntary sale when fixing valuation formula); *Rogers v. Rogers,* 296 *N.W.2d* 849 (Minn.1980) (buy-sell agreement given two-step effect for purposes of marital distribution).[3]

---

[3]The Minnesota Supreme Court set aside a trial court determination of the value of an interest in a closely held corporation at $600,000 as contrasted to a $254,000 buy-sell agreement. Even though husband/controlling shareholder had an 85% interest, the court recognized that he might not be able to induce a modification of the agreement or might not wish to sell the business, or indeed might die before realizing the potential profits from the business.

Finally, the defendant argues that the court should not value his interest above its buy-sell value, since if he must sell his shares, the price he would receive would be limited by the buy-sell restriction. But there should be no reason to sell the shares since the court can fashion the distribution so that a sale need not occur. Furthermore, to give the buy-sell agreement conclusive effect would not recognize the realities of the present situation: The shareholder will not sell the stock and, one hopes, will not die. In other words, he will continue to experience the benefits of being a 22% shareholder and an employee.

Under the conditions stated in *Stern,* an up-to-date buy-sell agreement will provide presumptive evidence of value of a minority share in a firm. All those conditions were not present here and so the court below was obliged to consider the other proofs. It may choose to give evidentiary weight to the agreement insofar as it is reliable although incomplete.

### (b) *Gross Operating Profit Capitalization*

As previously noted, the range of proofs was extreme indeed, going from $70,000 to $338,000. Yet, each of the experts was soft at the margins of his opinion. The husband's expert agreed that he would not recommend that his client sell his share for the figure of $70,000 since the client was gainfully employed in the business and it had an intrinsically higher value for him. Conversely, the wife's expert conceded that there was a wide range of values and in his redirect examination suggested that his "bottom line" figure was $180,000. There was also evidence that in a recent financial statement the husband himself had fixed the value of his interest in Polycel at $132,000 and the husband's accountant had fixed the buy-sell value at $92,000.

---

296 *N.W.*2d at 852. It suggested a two-step arrangement by awarding the wife her share of the $254,000 set by the buy-sell agreement and providing for future adjustment if the appellant lives out his expected working life, sells the company, or modifies the buy-sell agreement. *Id.* at 854. We prefer that the issue be settled at the time of judgment.

Expert opinion testimony of an accountant is not significantly different from any other form of expert testimony: "Under Rule 56(2)(b), expert testimony is admissible only if the expert has sufficient expertise to offer the intended testimony *and the testimony itself is sufficiently reliable.*" *State v. Cavallo,* 88 *N.J.* 508, 516 (1982) (emphasis added). In *Cavallo,* we stressed that reliability is critical in determining the admissibility of expert scientific evidence. Reliability can be established by showing general acceptance in the scientific community through proofs of expert testimony, scientific and legal writings, or judicial opinions. *Cavallo,* 88 *N.J.* at 521. Those principles applicable to scientific testimony can be helpful here in evaluating expert opinion testimony as to value.

Plaintiff's accountant based his high figure of $338,000 upon the application of an earnings capitalization rate of five to the net profit of the company. While earnings capitalization is one factor in valuation, *compare* Rev.Rul. 59–60, at § 4.01(d), § 4.02(d), and § 6, plaintiff's accountant could offer no basis in generally accepted accounting principles for his capitalization rate of five as applied to the net profit from sales figures. It was simply his opinion, "from experience", "[j]ust historical in other businesses that I have dealt with." The range of rates was anywhere from five to twelve, according to plaintiff's accountant. He chose the low end of the range to reflect defendant's minority interest in Polycel, but offered no external proof to justify his choice.

In *Dugan,* we rejected the use of a capitalization rate of five times earnings in the context of that one-person professional services corporation: "No evidence supported capitalization at that figure." 92 *N.J.* at 443. We hold that a court should not base an opinion on theories of value that lack support in the record, demonstrated market reliability, or general acceptance.

The experience of our Tax Court in the area of valuing real estate properties is illustrative. In *Glen Wall Assoc. v. Wall Tp.,* 6 *N.J.Tax* 24 (1983), the court emphasized that the real estate

market, not the unsupported opinions of experts, is the evidence upon which a court can establish value. The taxpayer's witness testified that a 10% capitalization rate was appropriate, based on certain indicators in the financial market. He admitted, however, that the number was " 'basically a judgment call.' " *Id.* at 30. The court found:

> Such evidence does not establish to the satisfaction of this Court a capitalization rate to be used in determining real estate value. The best evidence of such a capitalization rate is to be obtained from the real estate market, and the rates used by the witness were not related by him to the real estate market.
>
>    \*      \*      \*      \*      \*      \*   . \*      \*
>
> The mere qualifying of a witness as an expert does not permit him to give unsupported opinions. The witness' expertise qualifies him to take *facts* and to conclude from those facts an opinion relevant to the issue before the court which a nonexpert, with the same data, could not do. The evidence, data and the totality of the facts on the basis of which the opinion is arrived at must be made known to the court so that it may evaluate the validity of the opinion and conclude what weight, if any, is to be given to that opinion. [*Id.* at 31–33 (footnote omitted, emphasis in original).]

*See also Buckelew v. Grossbard,* 87 *N.J.* 512, 524 (1981) ("net opinion" rule establishes that "an expert's bare conclusions, unsupported by factual evidence, is inadmissible"); *Highview Estates v. Borough of Englewood Cliffs,* 6 *N.J.Tax* 194, 214 (1983) (while Evidence Rule 56 "has eased the expert's testimonial burden it has not eliminated the need for the expert to base his opinion on facts made known to the court."). The sources of an expert's testimony must be relevant as well as reliable. The parties must present evidence that has demonstrated market reliability (*e.g.,* data of comparable corporations that are publicly traded) or is otherwise generally accepted as reliable by experts or by courts (*e.g.,* relevant appraisal manuals, authoritative industry guides, or factual foundations in the record before the court).

### (c) *Formula Approach*

The other method of valuation used below was a formula approach based on Revenue Ruling 59–60,[4] devised by the IRS for valuing property for federal tax purposes. As we described it in *Dugan,* a formula approach "requires a determination of income from the tangible assets, and subtraction of that income from the total income. The residual is capitalized and the balance is designated goodwill." 92 *N.J.* at 436.[5]

The experts differed in their application of the formula in several respects. Plaintiff's accountant believed a return of 10% on fixed assets was appropriate, while defendant's held out for 12½%. Both employed a capitalization rate of 20% (5 times return on intangibles) but disagreed over whether a 30% discount for defendant's minority interest should be applied.

---

[4]Defendant's expert also employed a comparative approach, referring to an IRS Technical Memorandum that described a company similar to Polycel, but he did not place primary reliance on it.

[5]Although both accountants described their appraisals as based on Revenue Ruling 59–60, both incorporated the provisions of Rev.Rul. 68–609, 1968–2 C.B. 327, which supplemented Rev.Rul. 59–60. It provides:

The "formula" approach may be stated as follows:

A percentage return on the average annual value of the tangible assets used in a business is determined, using a period of years (preferably not less than five) immediately prior to the valuation date. The amount of the percentage return on tangible assets, thus determined, is deducted from the average earnings of the business for such period and the remainder, if any, is considered to be the amount of the average annual earnings from the intangible assets of the business for the period. This amount (considered as the average annual earnings from intangibles), capitalized at a percentage of say, 15 to 20 percent, is the value of the intangible assets of the business determined under the "formula" approach.

The percentage of return on the average annual value of the tangible assets used should be the percentage prevailing in the industry involved at the date of valuation, or (when the industry percentage is not available) a percentage of 8 to 10 percent may be used.

The 8 percent rate of return and the 15 percent rate of capitalization are applied to tangibles and intangibles, respectively, of businesses with a small risk factor and stable and regular earnings; the 10 percent rate of return and 20 percent rate of capitalization are applied to businesses in which the hazards of business are relatively high.

Plaintiff's expert said he "built in a discount" by not using a higher capitalization factor of 7 or 8. The parties also disagreed over whether the sale of one piece of machinery was to be considered an extraordinary income item and whether the earnings should be capitalized before or after taxes.[6]

In resolving these issues, the court could consider the appointment of an independent expert to assist it. *R.* 5:3–3. We have emphasized the important role that court-appointed experts may play in resolving issues of technical complexity before a court. *Southern Burlington Cty. NAACP v. Mount Laurel Tp.*, 92 *N.J.* 158, 292–93 (1983). We also recognize that it may be overbroad in cases of this magnitude to employ three expert witnesses, each of whom must be compensated, to arrive at fair value. But the Case Information Statement, *R. 5:5–2* (eff. April 1, 1984), and other discovery methods can be used to narrow the issues so that a court will employ an independent expert to assist it only in evaluating the points of difference. We believe that method could be used here to fix the value after reliance upon an independent expert to resolve the differences expressed in employing Revenue Ruling 59–60.

Naturally, the ultimate responsibility for disposition of the assets would remain with the Family Part. A fair and workable system of distribution still must be made. One of the problems below was that there was no liquid value for the husband's stock, and if it were ordered sold, the price would be fixed by the buy-sell agreement. Hence, defendant argued, there was no way to distribute the stock fairly. Perhaps, part of the defendant's share of the proceeds of the sale of the house could be used to make a down payment on the plaintiff's share of the corporate property with the balance being paid out over an extended period of time on terms the court may determine. The issue of

---

[6]The parties disagreed over whether to use three or four years' earnings in applying Rev.Rul. 59–60. That Ruling recommends the use of five or more years. *Id.* at § 4.02(d). In *Dugan,* we expressed a preference for the use of five years' earnings, 92 *N.J.* at 441, but since Polycel Corporation is relatively young, the parties' ultimate choice of a lesser number may be acceptable.

alimony may have to be reviewed in light of the revised equitable distribution plan. *See Painter v. Painter,* 65 *N.J.* 196 (1974).

In sum, we hold: (1) courts must arrive at a value for closely held corporate stock to effect equitable distribution of the asset to one spouse; (2) a comprehensive buy-sell agreement will provide presumptive evidence of such value; (3) opinions of value not based upon evidence in the record or of proven acceptance in the field should be given little weight; and (4) courts should employ independent experts under Rule 5:3–3 when necessary to resolve specific disagreements between the parties' experts. The judgment of the Appellate Division is reversed and the cause remanded to the trial court for further proceedings in accordance with this opinion.

*For reversal and remandment*—Chief Justice WILENTZ and Justices CLIFFORD, SCHREIBER, POLLOCK, O'HERN and GARIBALDI—6.

*For affirmance*—None.