## IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON

**FILED**

**March 2, 2000**

Madison Chancery No. 51506

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

DOROTHY WEST HARMON,     )
     )
     Plaintiff/Appellant,     )
     )
**v.**     )
     )
HARVEY CARL HARMON,     )     Appeal No. W1998-00841-COA-R3-CV
     )
     Defendant/Appellee.     )

### APPEAL FROM THE CHANCERY COURT OF MADISON COUNTY
### AT JACKSON, TENNESSEE

### THE HONORABLE JOE C. MORRIS, CHANCELLOR

For the Plaintiff/Appellant:

Joy Tanner Bomar
Memphis, Tennessee

For the Defendant/Appellee:

Maclin P. Davis, Jr.
K. Suzanne Crenshaw
Nashville, Tennessee

**AFFIRMED IN PART, REVERSED
IN PART AND REMANDED**

HOLLY KIRBY LILLARD, J.

CONCURS:

W. FRANK CRAWFORD, P.J., W.S.

ALAN E. HIGHERS, J.

**OPINION**

This is a divorce case. The husband is a physician employed by a professional association. The trial court granted the wife the divorce and awarded the wife, *inter alia*, 50% of the value of the husband's interest in his medical practice and 45% of the husband's retirement and profit sharing plans. The wife was awarded alimony *in futuro* of $6000 per month for 13 years. The husband was ordered to assume responsibility for the parties' marital debt. The wife's request for attorney's fees was denied. The wife appeals the trial court's valuation of the husband's interest in the medical practice, the amount of alimony awarded, the division of the retirement and profit sharing plans, and the denial of attorney's fees. The husband appeals the trial court's order that he pay the marital debt. We reverse the trial court's valuation of the husband's interest in his medical practice, holding that the values set forth in buy-sell agreements executed by the husband are relevant but not binding on the wife in the divorce. The remainder of the trial court's decision is affirmed.

Harvey Carl Harmon, M.D. ("Husband") and Dorothy West Harmon ("Wife") married in 1977. It was the second marriage for both. Wife had one child, a seven-year-old son, from her previous marriage. At the time the parties married, Husband had already completed medical school and residency, and was a surgeon on the teaching staff of the University of Tennessee Medical School in Memphis. He also had private patients. Wife was a registered nurse at Baptist Hospital in Memphis.

Wife continued to work full-time for about a year after the parties married, but quit work at the birth of their daughter in June 1978. Wife worked full-time for a short while after the parties moved to Blytheville, Arkansas in 1981, and then again became a full-time homemaker. For about six years prior to the parties' separation, Wife worked part-time.

In 1984, the family moved to Jackson, Tennessee. In August 1985, Husband joined the practice of the Jackson Clinic ("Clinic") as a general surgeon. The Jackson Clinic, P.A. is a professional multispecialty medical association. In 1996, it employed approximately 108 physicians and 525 non-physician employees at 18 locations throughout West Tennessee. Husband's August 1, 1995 employment contract with the Clinic contained a non-compete clause. The non-compete clause stated that, should Husband leave the Clinic before age 60, he must either refrain from practicing medicine in Madison County for one year, or pay the Clinic $50,000. At the time of trial Husband was still employed as a general surgeon at the Clinic. He also owned 10 shares of Clinic stock, which constituted 1.17% of the Clinic's outstanding shares. In 1986, Husband also invested

in the Jackson Clinic Building, Limited, ("Building, L.P."or "Building"), a limited partnership of which the Clinic is the general partner. The Building, L.P. was formed, "to engage in the business of owning, managing, improving, leasing and selling real property including, but not necessarily limited to, the ownership, management and leasing of Clinic buildings." Husband was one of 92 limited partners and owned approximately 1.09% of the units of ownership of the Building, L.P.

The bylaws of the Clinic and of the Building, L.P. each contain "buy-sell"clauses that state that the value of each share of stock is to be set annually by the Clinic's directors, and that should a physician member wish to sell his or her shares, he or she is bound to that price. The Clinic's bylaws read:

> For the purpose of valuing the shares of stock in the Association upon redemption or cancellation, the fair value of a share of stock in the Association shall be determined by the Board of Directors with the assistance of the Association's accountant, and a certificate of value shall be filed in the minute book of the Association at least annually. The most recent such certificate shall be used to determine the fair value of a share of stock whenever transfer, issue, redemption, or cancellation is to be accomplished. . . . In determining book value, the Association's accountant shall observe the following:
> (i) No allowance or assignment of value shall be made for goodwill, the Association's name, or any similar intangible asset.
> (ii) All accounts payable shall be taken at face amount less any applicable or available discounts.
> (iii) No allowance or assignment of value shall be made for accounts receivable (except upon dissolution of the Association). . . .
> (iv) All machinery, fixtures and equipment shall be taken as the valuation appearing on the books of the Association.
> (v) No allowance or assignment of value shall be made for supplies.
> (vi) All unpaid and accrued taxes shall be deducted as liabilities.

Section 2.13 of the Building's bylaws states:

> Determining Current Value of Units. The fair market value of the net assets of the Limited Partnership shall constitute the aggregate value of the units of ownership of the Limited Partnership for the purposes of this Agreement. A determination of the fair market value of the net assets of the Limited Partnership shall be made from time to time by the General Partner and submitted in writing to the Limited Partners as soon as practicable thereafter.

The Building L.P.'s bylaws further state:

> If the remaining or surviving Limited Partners or the General Partner elect to purchase such interest as herein above prescribed, the purchase price for such limited partner's interest shall be equal to the value of his units of ownership of the Limited Partnership as determined pursuant to Section 2.13 herein above [quoted above].

The parties separated at least twice before their final separation on December 29, 1995. Wife filed for divorce on February 13, 1996. Wife's divorce complaint included a request for an order enjoining Husband from "disposing of, encumbering, transferring, compromising or in any way

2

depleting any of the marital assets," and requiring that the parties' financial status quo be maintained.

Husband was ordered:

> to absolutely desist and refrain and be enjoined from unilaterally disposing of, encumbering, transferring, compromising or in any way depleting any of the marital assets and/or financial benefits from employment and/or personal property of any kind or description wherever situated and in whatever form except for reasonable and necessary living and litigation expenses; further that both Plaintiff and Defendant maintain the financial status quo until further order of this Court to enable this Court to make a determination relative to the assets and liabilities of the parties available for classification and distribution pursuant to T.C.A. §36-4-121.

Wife's efforts to value Husband's interest in the Clinic and the Building resulted in numerous disputes between the parties and considerable delay in the trial. The business evaluator hired by Wife eventually obtained enough information to arrive at what Wife termed a "ballpark figure" for the "net asset value" of Husband's interest in the Clinic and in the Building. Based on this, prior to trial, the parties entered into a stipulation on the net asset value of Husband's interests in the two entities. The parties stipulated that the current net asset value of Husband's interest in the Clinic at that time was $250,000, and that the current net asset value of Husband's interest in the Building, L.P. at that time was $180,000. The stipulation specified that it did not prejudice Husband's right to argue that his interest in the Clinic and in the Building, L.P. was equal only to what he would receive from the sale of his shares under buy-sell contracts with the Clinic and the Building, L.P. The stipulation states:

> In order to avoid further delay and expense associated with the valuation of Husband's interest in the Jackson Clinic and his interest in the Jackson Clinic Building, L.P. the parties stipulate as follows:
> 1) the net asset value of Husband's interest in the Clinic is worth $250,000 at the present time. However, Husband has entered into a contract with the Clinic which provides for payment of a sum fixed by the Board of Directors upon the sale of his stock under certain circumstances. This stipulated valuation of Husband's interest in the Clinic is without prejudice to Husband's right to contend that his interest in the Clinic is worth only what he would receive if he sells it under the aforementioned agreement with the Clinic.
> 2) Husband's interest in the Jackson Clinic Building, L.P. is worth $180,000 at the present time unless he withdraws from the Building L.P. This stipulated valuation of Husband's interest in the Building L.P. is without prejudice to Husband's right to contend that his interest in the Building L.P. is worth only what he would receive for it if he withdraws or leaves the L.P. or the Clinic which is the amount Husband would receive pursuant to his contract with the L.P.

3

From the time that the complaint was filed until the trial, both parties filed a number of motions and petitions before the trial court. These included a motion by Husband for release of funds, and at least two petitions for contempt filed by Wife.

On December 3, 1996 Husband filed a motion for release of funds, seeking permission to use funds ("the Westlake funds") from an account that held $71,200.00 received from a marital asset, Westlake Watertown Associates, Ltd. Husband sought to use the Westlake funds to pay marital debt, including a $25,000 bank debt. Husband asserted that the court's status quo injunction did "not allow for the payment of reasonable business expenses and payment of debts (both personal and business) as they become due." On December 31, 1996, prior to the trial court's ruling on his motion, Husband paid the $25,000 bank loan with a check written on the account containing the Westlake funds. The record on appeal includes no disposition of Husband's motion. However, on June 5, 1996 Husband and Wife entered into a consent decree that partially amended the injunction. The consent decree permitted the payment of ordinary and reasonable business expenses, as well as living and litigation expenses. Husband and Wife agreed:

> 1. That both parties shall be enjoined from encumbering, concealing, disposing of, damaging, destroying, converting, compromising or hypothecating any of the real estate or personal property or other marital assets or benefits in either party's possession or under either party's control, . . . pending further orders of this Court, with the exception of reasonable, necessary and ordinary living and litigation expenses and reasonable, ordinary and necessary business expenses.
> 2. That both parties further mutually agree that Wife shall have ready access, through her business evaluator/appraiser, to any and all books, records, documents or other pertinent data relating to any business interests in which Husband has invested marital or separate funds.

Husband's use of the Westlake funds prompted Wife to file a petition for citation for contempt, alleging that Husband had violated the injunction to maintain the parties' financial status quo by paying the $25,000 bank debt with the Westlake funds.

A second petition for citation for contempt was later filed, alleging that Husband violated the financial status quo injunction by signing a purchase agreement on a house for his paramour, Edith Trotter ("Ms. Trotter"), and by his guarantee of Ms. Trotter's $238,000 loan. Husband had been ordered to pay Wife's attorney's fees, and Wife alleged that he violated the injunction by using the Westlake funds to pay $15,000 of Wife's attorney's fees.

The trial was held on June 21, 1998. Wife introduced evidence of Husband's use of the Westlake funds to pay the bank debt, to pay $15,000 of Wife's attorney's fees, and to pay Husband's

4

attorney's fees of $8,649. Wife argued that Husband's payment of these debts with the Westlake funds constituted a violation of the parties' status quo injunction. Wife said that Husband's filing of the motion for release of funds showed that he knew that his use of the funds without the trial court's permission was a violation of the injunction. Husband argued that his use of the funds was not a violation of the trial court's injunction because he had used the funds to pay only reasonable and necessary living, litigation and business expenses.

Wife called Ms. Trotter to testify at the trial. Ms. Trotter acknowledged that Husband had signed the purchase agreement on her home, and also guaranteed her $238,000 loan. She admitted that the house was purchased in her name because of the trial court's injunction. She indicated that Husband had helped her with the mortgage payments.

The main issue at trial was the value of Husband's interest in the Clinic and Clinic Building, L.P. Wife asserted that the trial court should use the parties' stipulated net asset values. She argued that Husband's buy-sell agreements with the Clinic and Building, L.P., were designed to discourage physicians from leaving the Clinic, and therefore set an artificially low price per share. She asserted that the share price set by the Clinic did not reflect the actual value of Husband's interest because it did not include the accounts receivable or the inventory. Husband argued that the Clinic and Building, L.P. should be valued in accordance with the buy-sell agreement because he would be bound to that price if he sold his shares.

After the trial, the trial court granted Wife the divorce on the grounds of Husband's inappropriate marital conduct. The trial court found that Husband had a gross monthly income of $28,475.94 and a net monthly income of $18,673.23. It found that Wife had an annual gross income of only $3,120.00. The trial court concluded that all of the parties' assets were accumulated during the marriage, and thus were marital property. The trial court found that the parties' stipulation on the value of the Clinic and Building, L.P. was the value upon liquidation. Since there was no plan to liquidate either business, the trial court stated that Wife was bound to the value set by Husband's buy-sell agreements with the Clinic and the Building, L.P., even though Wife was not a party to those agreements. The trial court found that, under the terms of Husband's agreement with the Clinic and Building, L.P., Husband would receive $22,570.55 for his stock in the Clinic, and $120,690 for his stock in the Building, L.P. Therefore, the trial court awarded one-half of this value to Wife, ordering Husband to pay her $71,630.25, the total of half the value of Husband's shares in

5

the Clinic ($11,285.25) and half the value of Husband's shares in the Building, L.P. ($60,345).

The trial court awarded Wife the marital residence, valued between $292,000 and $310,000 and ordered her to assume responsibility for the mortgage on it.[1] Husband was awarded the parties' lake house, and ordered to assume all responsibility for its mortgage.[2] Wife was awarded the household furnishings at the marital home, valued between $31,000 and $91,000, and Husband was awarded the lake house furnishings, valued at $10,000. The trial court awarded Wife a 45% interest in Husband's retirement and profit sharing plans, and ordered that all other assets of the parties be divided 55% to Husband and 45% to Wife. Husband was ordered to assume responsibility for the marital debt of $415,541, and to pay Wife alimony *in futuro* of $6000 per month for 13 years. Finally, the trial court denied Wife's request for attorney's fees, finding that Husband had advanced all of Wife's attorney's fees in the matter except for the balance due, and that Wife's award of marital assets was sufficient to pay her remaining attorney's fees. Both parties now appeal the decision of the trial court.

Wife raises four issues on appeal. She argues first that the trial court erred by applying the wrong valuation method to Husband's interest in the Clinic and Building. She also contends that the trial court erred by awarding Wife only 45% of Husband's pension and profit sharing plans, and other marital property. She maintains that the trial court erred by awarding her only $6000 per month in alimony, and in declining to award her attorney's fees. Husband argues on appeal that the trial court erred by assigning to Husband the entire marital debt of $415,541.

Wife first argues that the trial court erred by valuing Husband's interest in the Clinic and Building, L.P. in accordance with the Clinic's buy-sell agreement with Husband. She contends that the appropriate value was the net asset value stipulated by the parties, because the net asset value looks to the net assets of the practice as a going concern, taking into account the value for items such as accounts receivable and supplies, which are specifically excluded from value set in the buy-sell agreement. She argues that there is no support for the trial court's finding that the net asset value was to be applied only upon liquidation. She notes that she was not a party to the buy-sell

---

[1] The record indicates that the mortgage on the marital residence was $225,900.

[2] The trial court did not assign a value to the lake house in either its findings or in its final judgment. However, both parties agreed that the house's value was $52,000, which apparently represented the equity in the home. Husband's Statements of Assets and Liabilities values the lake house at $175,000, with a mortgage of $123,000, leaving an equity of $52,000.

6

agreements, and disputes the trial court's legal conclusion that she is bound by the value set in the agreements.

Husband argues that the trial court's valuation of his interest in the Clinic and Building is correct because his interest cannot be valued at more than the price he would receive for the sale of his shares. In support of his argument, Husband cites Tennessee Code Annotated §48-101-613, which states that upon the "death, disqualification, transfer, retirement or termination of employment" of its shareholder, a professional corporation "must acquire, or cause to be acquired by a qualified person," the shareholder's shares. Subsection (b) states that if a price is fixed by the association's bylaws or charter, that price controls. Husband also cites Tennessee Code Annotated § 36-4-121(b)(1)(A), which states that marital property in a divorce is to be "valued as of a date as near as reasonably possible to the final divorce hearing date." Husband asserts that, at the time of the divorce hearing, he could sell his shares in the association only to the association itself for $22,225.70, and could sell his shares in the Building only to the Building for $126,900. Consequently, he maintains that these figures represent his value in the Clinic and in the Building, Limited.

Husband argues that the trial court's valuation of Husband's interests in the Clinic and the Building is a finding of fact, and that therefore the standard of review is a presumption of the correctness of this factual finding unless the preponderance of the evidence is to the contrary. Normally, the trial court's valuation of a marital asset is a finding of fact; however, in this case, the trial court concluded that, as a matter of law, Wife was bound by the buy-sell agreements entered into by Husband. Consequently, the appropriate standard of review for the trial court's conclusions of law is *de novo*, with no presumption of correctness. *See Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993).

On several occasions, Tennessee appellate courts have discussed the valuation, for purposes of divorce, of a professional association such as a medical practice. In *Smith v. Smith*, 709 S.W.2d 588, 592 (Tenn. Ct. App. 1985), involving valuation of the husband's law practice, the Court found that the husband's professional goodwill was not a marital asset, and that the valuation should include only physical assets and accounts receivable. This was applied to a medical practice in *Hazard v. Hazard*, 02-A-01-9105-CH-0096, slip op. at 6-8, 16 T.A.M. 52-6 (Tenn. Ct. App. Dec. 3, 1991), *perm. to appeal denied* (Tenn. March 23, 1992), cited in *York v. York*, App. No. 01-A-01-

7

9104-CV-00131, 1992 WL 181710 at **2 (Tenn. Ct. App. 1992).

Subsequent cases have noted, however, that both *Smith* and *Hazard* involved a professional practice in which the "value as a going concern and its business reputation were inseparable from the professional reputation of the [divorcing spouse] practitioners." *York* at **3. In a larger professional association which does not depend on the reputation of a single practitioner, Tennessee courts have not limited the valuation to the value of the physical assets and the accounts receivable. In *Witt v. Witt*, 01-A-01-9110-CH-00360, 17 T.A.M. 15-6 (Tenn. Ct. App. March 20, 1992), the husband was chief of radiological services at a hospital and also operated a diagnostic clinic with eight technicians that provided services to referring physicians. The Court approved the trial court's finding that the value of the husband's medical practice substantially exceeded the net asset value even if the husband's professional goodwill were excluded. *Id.* at **3.

In *York v. York*, the Court discussed at length the method for valuation of a divorcing spouse's interest in a large professional association. *York* at **2-4. In *York*, the husband owned an interest in a multispecialty medical group that employed eleven physicians, ten nurses, one psychologist and one optometrist. The group owned a $3,000,000 building which housed various medical offices. *Id.* at **2.

The *York* Court found the husband's medical practice to be more similar to the practice in *Witt* than to a traditional solo medical practice. The trial court in *York* likened the professional association to a closely held corporation and indicated that, while future income projections would not be considered, other factors such as "corporate good will" and the price at which other physicians had purchased stock would factor into the valuation of the husband's interest. *Id.* at **4. This was affirmed by the appellate court, which stated:

> No mathematical formulas exist for determining the value of a professional practice such as MedCore. It is a factually driven inquiry that requires the trial court to weigh and evaluate all relevant evidence regarding value.

*Id.* Against this background we examine the trial court's conclusion that the parties' stipulated net asset value was applicable only upon liquidation and that Wife was bound by the valuation set forth in the buy-sell agreement executed by Husband.

Our research reveals no Tennessee cases directly addressing the issue of whether Wife was bound by the value stated in the buy-sell agreements. Consequently, we examine caselaw from other jurisdictions.

A small minority of courts hold that, in a divorce, the non-shareholder spouse is bound by a shareholder valuation agreement entered into by the shareholder spouse. In *Hertz v. Hertz*, 99 N.M. 320, 325, 657 P.2d 1169, 1174 (N.M. 1983), the husband in a divorce case was a shareholder in a large law firm, and the court considered whether the valuation of his interest in the law firm should include a value for professional goodwill. The law firm's restrictive stock agreement set the value of goodwill and other intangible assets at $1.00 in the event of sale of the stock. The *Hertz* court held that the wife was bound by this provision in the law firm's agreement. The *Hertz* court reasoned that, if the shareholder husband terminated his employment with the law firm, he could not realize the value of the firm's goodwill, and that the non-shareholder spouse should not "receive a greater value than that of the shareholder. . . ." *Id.* Later cases have limited *Hertz* to its facts, noting that:

> It would be equally inequitable and disturbing to permit the shareholder spouse to retain the entire community interest in the goodwill by simply entering into a restrictive shareholders' agreement and then later realizing the value upon resale of the professional association, change in the agreement, or otherwise.

*Cox v. Cox*, 108 N.M. 598, 775 P.2d 1315, 1318 (N.M. Ct. App. 1989). *See also McDiarmid v. McDiarmid*, 649 A.2d 810, 815 (D.C. Ct. App. 1994) (where partnership agreement provided husband could not recoup value of goodwill in law firm, wife was bound).

Another court has held that a shareholder's agreement can establish a "presumptive value" for the divorcing spouse's shares. In *Stern v. Stern*, 331 A.2d 257, 259 (N.J. 1975), the law firm's partnership agreement included a provision for payment of a partner's interest upon death. The court found that this value in the partnership agreement established a "presumptive value" for the husband's interest in the firm:

> Generally speaking, the monetary worth of this type of professional partnership will consist of the total value of the Quarters' capital accounts, accounts receivable, the value of work in progress, any appreciation in the true worth of tangible personalty over and above book value, together with good will, should there in fact be any; the total so arrived at to be diminished by the amount of accounts payable as well as any other liabilities not reflected on the partnership books. Once it is established that the books of the firm are well kept and that the value of partners' interests are in fact periodically and carefully reviewed, then the presumption to which we have referred

should be subject to effective attack only upon the submission of clear and convincing proofs.

*Id.* at 260. The holding in *Stern* has been limited somewhat in *Bowen v. Bowen*, 473 A.2d 73 (N.J. 1984), which emphasized that the value fixed in the partnership agreement is only to be considered the presumptive value in situations, such as in *Stern*, where the books are well-kept, the proper factors are considered, and the value is periodically and carefully reviewed. *Id.* at 78.

The clear majority of courts hold that the value established in the buy-sell agreement of a closely-held corporation, not signed by the non-shareholder spouse, is not binding on the non-shareholder spouse but is considered, along with other factors, in valuing the interest of the shareholder spouse. This was discussed by the West Virginia Court of Appeals in a case in which the divorcing husband had executed a buy-sell agreement with his medical corporation. In *Bettinger v. Bettinger*, 396 S.E.2d 709, 714 (W.Va. 1990), the Court observed:

> . . . [A] majority of courts which have considered a buy-sell agreement in a closely held corporation setting the stock value for equitable distribution purposes has determined that such an agreement should not be considered as binding, but rather should be weighed along with other factors in making a determination as to the value of such stock. *E.g., In re Marriage of Melnick*, 127 Ill. App.3d 102, 82 Ill. Dec. 228, 468 N.E.2d 490 (1984); *In re Marriage of Moffatt*, 279 N.W.2d 15 (Iowa 1979); *Rogers v. Rogers*, 296 N.W.2d 849 (Minn. 1980); *Bowen v. Bowen*, 96 N.J. 36, 473 A.2d 73 (1984); *Amodio v. Amodio*, 70 N.Y.2d 5, 516 N.Y.S.2d 923, 509 N.E.2d 936 (1987); *In the Matter of the Marriage of Belt*, 65 Or. App.606, 672 P.2d 1205 (1983); *Bosserman v. Bosserman*, 9 Va. App. 1, 384 S.E.2d 104 (1989); *Arneson v. Arneson*, 120 Wis.2d 236, 355 N.W.2d 16 (Wis.App.1984). It is apparent that buy-sell agreements in a closely held corporation can be manipulated by the shareholders to reflect an artificially low value. This is why caution should be exercised in accepting their value for equitable distribution purposes.

*Id.* at 715.

In a similar divorce case, the Virginia Court of Appeals rejected the argument that a restrictive buy-sell agreement on stock controlled the value to be assigned to the shareholder spouse's interest in the corporation, stating:

> In a majority of jurisdictions, the price set by a buy-out provision does not control the determination of value when the other spouse did not consent or was not otherwise bound by its terms. This is so even though the agreement was executed after the marriage. The reason for rejecting the value set by buy-out provisions is that they do not necessarily represent the intrinsic worth of the stock to the parties. Some courts, however, consider buy-out provisions a factor to be considered. Other jurisdictions hold that the terms of the restriction presumptively control value, while a small minority regard the value specified in the agreement as controlling.
> A decision to reject the valuation method set by a restrictive transfer agreement or by-law does not mean that they are not binding and enforceable between the business partners. Many legitimate business purposes, such as protecting the business from outside intervention or change in ownership, providing economic continuity, and estate and tax planning, are served by such provisions. The

price established for buy-out purposes, however, is often artificial and does not always reflect true value. The very purpose of such provisions or agreements often is to discourage sales by restricting the price which could be realized to less than the actual value to the owner.

***

On the other hand, the limitation created by the restrictive agreement necessarily affects the actual marketability of the stock, and thus its value. . . . When stock is subject to a restrictive transfer agreement or by-law, the price fixed by such provisions will not control its value, but the restriction on transfer is a factor which affects the value of the stock for purposes of equitable distribution.

*Bosserman v. Bosserman*, 384 S.E.2d 104, 108 (Va. App. 1989) (citations omitted).

In explaining the rationale for the majority view, some courts have noted that the issue is not the value the shareholder spouse would receive if he sold his shares, but rather the current value to the shareholder of his interest in the corporation. In *Bowen v. Bowen*, 473 A.2d 73 (N.J. 1984), the shareholder spouse had a minority interest in a closely held corporation, subject to a buy-sell agreement which set a value that excluded the corporation's goodwill and other intangible assets. The Court held that the buy-sell agreement would be considered but was not dispositive. *Id.* at 79. The Court explained:

> . . . [T]he defendant argues that the court should not value his interest above its buy-sell value, since if he must sell his shares, the price he would receive would be limited by the buy-sell restriction. But there should be no reason to sell the shares since the court can fashion the distribution so that a sale need not occur. Furthermore, to give the buy-sell agreement conclusive effect would not recognize the realities of the present situation: The shareholder will not sell the stock and, one hopes, will not die. In other words, he will continue to experience the benefits of being a 22% shareholder and an employee.

*Id. See also Money v. Money,* 852 P.2d 1158, 1161 (Alaska 1993); *Drake v. Drake*, 809 S.W.2d 710, 713 (Ky. App. 1991); *In re Marriage of Keyser*, 820 P.2d 1194, 1196 (Colo. App. 1991); *Bosserman v. Bosserman*, 384 S.E.2d 104, 108 (Va. App. 1989).

We find that the majority view is more consonant with the valuation approach outlined in Tennessee decisions such *York v. York*. The *York* court rejected the notion of "mathematical formulas" for such a valuation and emphasized that valuation of a professional corporation, such as Husband's in this case, is "a factually driven inquiry that requires the trial court to weigh and evaluate all relevant evidence regarding value." *Id.* at **4.

In light of this holding, we must evaluate the trial court's ruling in this case. The trial court first considered the parties' stipulation on net asset value, in which they agreed that "the net asset value of Husband's interest in the Clinic is worth $250,000 at the present time," that "Husband's interest in the Jackson Clinic, Building, L.P. is worth $180,000 at the present time unless he

11

withdraws from the Building, L.P.,"and that the stipulation of these values did not prejudice Husband's right to argue that the value should be that set out in the buy-sell agreements. The trial court found that the net asset value stipulated by the parties was the value upon liquidation and held it inapplicable because there was no plan to liquidate the Clinic. The stipulation does not state that the stipulated value would be applicable only in the event of dissolution, and the trial court did not give the reason for its conclusion. Indeed, the Court in *York* considered the "net asset value" of the husband's interest in his incorporated multispecialty medical group. We do not find evidence in the record supporting the conclusion that the stipulated net asset value is applicable only in the event of dissolution.

The trial court held that the valuation of Husband's interest was governed by the value established in the buy-sell agreements. As noted above, we adopt the majority view on the weight given to such agreements, holding that they may be considered along with any other relevant evidence on valuation, but are not controlling. Consequently, we reverse the trial court's holding on this issue. The cause must be remanded to the trial court for valuation of Husband's interest after consideration of all relevant evidence, including but not limited to the parties' stipulated net asset value and the values set forth in the buy-sell agreements.

Upon remand, the trial court may consider how closely the factors for valuation in the buy-sell agreements correlate with the factors mentioned in *York* and other applicable case law. The By-Laws of the Jackson Clinic Professional Association (Article VI, Section 3, (c)) state that in establishing the "book value" to be utilized in valuing the shares of stock, the following had to be observed:

> (i) No allowance or assignment of value shall be made for goodwill, the Association's name, or any similar intangible asset.
>
> (ii) All accounts payable shall be taken at the face amount less any applicable or available discounts.
>
> (iii) No allowance or assignment of value shall be made for accounts receivables (except upon dissolution of the Association). . . .
>
> (iv) All machinery, fixtures and equipment shall be taken at the valuation appearing on the books of the Association.
>
> (v) No allowance or assignment of value shall be made for supplies.
>
> (vi) All unpaid and accrued taxes shall be deducted as liabilities.

Thus, the By-Laws specifically delete items such as intangible assets, accounts receivable and

supplies.  As in **York**, Husband's medical corporation is an "incorporated multispecialty medical group" that does not depend solely on Husband's professional reputation for its value as a going concern.  **York**, at \*\*2-3.  Indeed, Husband's medical group in this case dwarfs that considered in **York**; while the group in **York** had eleven physicians and twelve non-physician professional employees, the Clinic in this case employs approximately 108 physicians and 525 non-physician employees at 18 locations.  Since Husband "will continue to experience the benefits of being a . . . shareholder and an employee," factors such as those deleted from the valuation in the buy-sell agreement are pertinent to the valuation of Husband's interests for purposes of the division of marital property.  **See Bowen**, 473 A.2d at 79.  Therefore, on remand, the fact that the buy-sell agreements specifically exclude substantial relevant factors should be considered.  Of course, the trial court may also consider whether "the limitation created by the restrictive agreement . . . affects the . . . value" of Husband's interest.  **Bosserman**, 384 S.E.2d at 108.

Wife next asserts on appeal that the trial court erred in its award of alimony. Wife contends that her monthly expenses are over $9000, that the trial court's alimony award of $6000 a month is insufficient to meet her needs, and that Husband has the ability to pay more than $6000 per month. Husband argues that Wife overstated her expenses, and that the trial court acted within its discretion in awarding Wife alimony of $6000 a month.

The trial court is afforded wide discretion concerning the award of alimony, and such an award should be reversed only in instances in which this discretion "has manifestly been abused." **Hanover v. Hanover**, 775 S.W.2d 612, 617 (Tenn. App. 1989); **Ford v. Ford**, 952 S.W.2d 824, 827 (Tenn. App. 1997).

Tennessee Code Annotated § 36-5-101 (d) (Supp. 1997) provides a non-exclusive list of factors a trial court is to consider, if relevant, in its determination of alimony, including "the relative earning capacity, obligations, needs, and financial resources of each party. . . ." "While there is no absolute formula for determining the amount of alimony, 'the real need of the spouse seeking the support is the single most important factor.' " **Aaron v. Aaron**, 909 S.W.2d 408, 410 (Tenn. 1995)(quoting **Cranford v. Cranford**, 777 S.W.2d 48, 50 (Tenn. App. 1989)).

Wife stated that she needed over $9000 per month in order to approximate her pre-divorce standard of living, and submitted a list of monthly expenses that totaled over $10,000. The trial court considered all of the evidence and testimony offered in the case, and awarded Wife $6000 per month for 13 years. After reviewing the record, we cannot conclude that the trial court abused its discretion. The trial court's award of alimony is, therefore, affirmed.

Wife further argues on appeal that the trial court erred in awarding her only 45% of Husband's profit sharing and pension plans and other marital property. She alleges that Husband dissipated the marital estate by $134,700 with his use of the Westlake funds to pay her attorney's fees, the bank debt, and his attorney's fees, and by his support of Ms. Trotter, and that all of this was in violation of the injunction requiring both parties to maintain the financial status quo. Wife asserts that, in its division of the marital property, the trial court failed to consider Husband's violation of the injunction and his dissipation of the marital estate. She maintains that, had the trial court considered Husband's dissipation of the marital estate, it would have awarded her more than 45% of the assets in question, and that its award of only 45% is inequitable. Wife asks that this Court reverse the trial court's 45-55 split of the property in question, and award her the $134,700 she alleges Husband dissipated.

A trial court is afforded wide discretion in dividing marital property, and its distribution will be given "great weight" on appeal. *Ford v. Ford*, 952 S.W.2d 824, 825 (Tenn. App. 1997). Guidelines for the equitable division of marital property are set forth in Tennessee Code Annotated § 36-4-121 (c) (Supp. 1997). Factors to be considered include the duration of the marriage, the estate of each party at the time of marriage, and "the contribution of each party to the acquisition, preservation, appreciation or dissipation of the marital or separate property, . . ." Tenn. Code Ann.§ 36-4-121(c) (5). It is undisputed that the trial court had before it all of Wife's petitions for citation for contempt, and that it heard her argument that Husband had violated the status quo injunction and dissipated marital assets. Wife points to nothing in the record supporting her assertion that the trial court failed to consider her allegations regarding Husband's violation of the injunction and his dissipation of assets. After reviewing the record, and giving great weight to the trial court's division of marital property, we cannot conclude that the trial court erred in awarding 45% of the assets at issue to Wife. The trial court's decision on this issue is affirmed.

Wife's last issue on appeal is whether the trial court erred in denying her request for the

balance due on her attorney's fees. Wife argues that the court erred in finding that Husband had advanced all of Wife's attorney's fees prior to trial, and that Wife would have sufficient liquid assets, after the division of marital property, to pay the balance of her attorney's fees. Wife asserts that the trial court ignored evidence that Husband used marital assets (the Westlake funds) to pay her attorney's fees, as well as some of his attorney's fees. Wife also asserts that the only liquid asset she received was the $67,592 annuity, and that she will have to pay penalties and taxes to cash it in. Wife seeks a reversal of the trial court's denial of attorney's fees, and either an award to her of the full $20,549.49 of attorney's fees requested at trial, or in the alternative a credit to her of half of her own attorney's fees of $15,000, and half of Husband's attorney's fees of $8, 649 for a total award to her of $11,734.50.

An award of attorney's fees in a divorce is considered to an award of alimony. *Long v. Long*, 957 S.W.2d 825, 829 (Tenn. App. 1997). As with alimony, a trial court has broad discretion regarding the award of attorney's fees, and it will not be reversed absent a showing that it abused that discretion. *Aaron v. Aaron*, 909 S.W.2d 408, 411 (Tenn. 1995) (citing *Storey v. Storey*, 835 S.W.2d 593, 597 (Tenn. App. 1992) and *Crouch v. Crouch*, 385 S.W.2d 288, 293 (Tenn. App. 1964)).

To support her contention that the trial court erred in finding that Husband had "advanced all of Wife's attorney's fees in the cause except for the balance due," Wife cites language used by the Tennessee Supreme Court in *Aaron*, 909 S.W.2d 408 (Tenn. 1995). *Aaron* was a divorce in which the husband had paid over $60,000 in his attorney's fees with marital assets. The husband was ordered by the trial court to pay Mrs. Aaron's attorney's fees of $38,184.98. The Court of Appeals modified the trial court's judgment, ordering that Mrs. Aaron's attorney's fees be paid out of proceeds from the sale of a marital asset, before the division of the marital estate. The Tennessee Supreme Court reversed the Court of Appeals and reinstated the trial court's judgment. The Supreme Court said that, by modifying the trial court's judgment, the Court of Appeals had in effect, "required Ms. Aaron to pay half of her own attorney's fees in addition to one-half of Mr. Aaron's." *Id.* at 411. The Supreme Court explained that "This [payment of Wife's attorney's fees out of the sale proceeds of a marital asset] was not what the trial court had in mind, and we can neither discern nor determine the basis for the Court of Appeals' ruling." Consequently, the Supreme Court reversed the Court of Appeals' ruling on the issue of attorney's fees because payment in the manner required by the intermediate appellate court had not been the trial court's intention, and there was

15

no justification for the appellate court's modification of the trial court's judgment.

In this case, it is undisputed that the trial court was aware of Wife's position on the issue of attorney's fees, including her argument that by paying Wife's fees with the Westlake funds Husband had not, in fact, advanced all of Wife's attorney's fees in the matter. The trial court nevertheless denied Wife's request for the balance owed on her attorney's fees. After reviewing the record, we cannot conclude that the trial court's decision was an abuse of discretion. Therefore, we affirm the trial court's denial of Wife's request for attorney's fees.

Husband argues on appeal that the trial court erred in ordering that Husband be responsible for the full $415,541 of marital debt. Husband contends that the trial court's order requiring him to assume this debt leaves him with an award of only 31% of the net marital estate. He maintains that this result is inequitable, particularly in view of the fact that Husband brought substantial assets to the marriage, and that Husband's income enabled the parties to accumulate most of the marital assets.

Wife contends that Husband's method of calculation is flawed, and that if calculated correctly, Husband's share of the net estate is closer to 45%. She notes that most of the debt was incurred by Husband in pursuit of his business ventures, and that Husband has the ability to pay the debt, while Wife does not.

The trial court's division of marital debt is part of its division of the marital estate. *Anderton v. Anderton*, 988 S.W.2d 675, 679 (Tenn. App. 1988). As such, the trial court's division of debt will not be reversed on appeal absent a finding that the trial court abused its discretion. "Marital debts should, where possible, follow their associated assets, and should be apportioned by considering the reason for the debt, the party who benefitted from the debt, and the party better able to assume the debt.' " *King v. King*, 986 S.W.2d 216, 219 (Tenn. App. 1998)(quoting *Roseberry v. Roseberry*, 1998 WL 47944) (citations omitted).

The record in this case indicates that much of the debt arose from Husband's business ventures. Since the trial court awarded Husband all of the interest in those businesses, and Husband clearly is the party with better ability to pay the debt, we find that the trial court did not abuse its discretion by assigning the entire debt of $415,541 to Husband. Therefore, we affirm the trial court's order that Husband be responsible for the $415,541 in marital debt.

In sum, we reverse the trial court's holding that the buy-sell agreements executed by Husband

were binding in the valuation of his interest in the Clinic and in the Building, as well as the valuation of Husband's interest, and remand for a factual finding on the valuation of Husband's interest in view of all relevant factors, including but not limited to the net asset values stipulated by the parties and the provisions of the buy-sell agreements. The remainder of the trial court's order is affirmed.

The decision of the trial court is affirmed in part, reversed in part and remanded as set forth above. Costs on appeal are to be divided equally between the Appellant, Dorothy West Harmon, and the Appellee, Harvey Carl Harmon.

_____
**HOLLY KIRBY LILLARD, J.**

**CONCUR:**

_____
**W. FRANK CRAWFORD, P. J., W.S.**

_____
**ALAN E. HIGHERS, J.**

17