**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0495-16T2
            A-3129-16T2

ROBERT SIPKO,

     Plaintiff-Respondent,

v.

KOGER, INC., KOGER
DISTRIBUTED SOLUTIONS,
INC., KOGER PROFESSIONAL
SERVICES, INC., KOGER
LIMITED (DUBLIN), and
RASTISLAV SIPKO,

     Defendants-Appellants,

and

GEORGE SIPKO,

     Defendant.

_____

ROBERT SIPKO,

     Plaintiff-Respondent,

v.

RASTISLAV SIPKO,

      Defendant-Appellant,

and

KOGER, INC., KOGER
DISTRIBUTED SOLUTIONS,
INC., KOGER PROFESSIONAL
SERVICES, INC., KOGER
LIMITED (DUBLIN), and
GEORGE SIPKO,

      Defendants.

_____

Argued February 10, 2020 – Decided  August 19, 2020

Before Judges Messano, Ostrer and Susswein.

On appeal from the Superior Court of New Jersey, Chancery Division, Bergen County, Docket No. C-000393-07.

Paul A. Sandars III argued the cause for appellants Koger, Inc., Koger Distributed Solutions, Inc., Koger Professional Services, Inc., and Koger Limited (Dublin) (Lum, Drasco & Positan, LLC, attorneys; Paul A. Sandars III and Bernadette Hamilton Condon, of counsel and on the briefs).

Joseph P. LaSala argued the cause for appellant Rastislav Sipko (McElroy Deutsch Mulvaney & Carpenter, LLP, and Neal H. Flaster, attorneys; Joseph P. LaSala, of counsel, Neal H. Flaster, on the briefs).

Appellant Rastislav Sipko filed a pro se reply brief in A-3129-16.

Michael S. Stein argued the cause for respondent (Pashman Stein Walder Hayden, PC, attorneys; Michael S. Stein and Dennis T. Smith, of counsel and on the briefs; Erik M. Corlett and Timothy Patrick Malone, on the briefs).

PER CURIAM

We consolidated these two appeals which arise from proceedings that followed the Supreme Court's remand in Sipko v. Koger, Inc., 214 N.J. 364 (2013). Since we write solely for the parties who are intimately familiar with the facts, we do not repeat the evidence adduced at the 2008–09 trial, which the Court explained in detail, id. at 367–72, except as necessary to provide some background and context for the issues now raised.

In 2000, defendant George Sipko, an experienced computer programmer who emigrated from Slovakia and formed Koger, Inc. (Koger), gifted 1.5% of the company's stock to his two sons, plaintiff Robert Sipko and defendant Ratislav (Ras) Sipko, who were both actively involved in the company's business.[1] Id. at 369. The gift was not recorded by any writing. Ibid. George also formed Koger Distributed Solutions, Inc. (KDS), and Koger Professional

---

[1] To avoid confusion, we use the first names of the family members. We intend no disrespect by this informality.

Services, Inc. (KPS), in 2002 and 2004 respectively, with Robert and Ras each owning 50% of each company's shares.[2]  Ibid.  The companies were formed as part of George's estate planning, although, at trial, the parties differed as to whether KDS and KPS developed their own products or served solely as licensing mechanisms for Koger's products and conduits for its income.  Id. at 369–70.

KDS and KPS reported substantial income in their first years, and all profits from the three Koger companies were shared at George's direction with George receiving 50%, and Robert and Ras each receiving 25%.  Id. at 370.  The relationships soured in fall 2005 because of Robert's romantic involvement with a woman of whom his mother disapproved.  Id. at 370–71.  At trial, the parties disputed what happened next, with Robert claiming his father physically threatened and coerced him into signing various documents, and George and Ras denying those claims and stating that Robert voluntarily executed the documents.  Id. at 371.  Robert admitted that, on February 3, 2006, he signed stock certificates transferring his interests in KDS and KPS back to the company "[f]or Value Received," but claimed he did so under duress and that someone

_____

[2]  Koger Limited (Dublin) was formed to facilitate operations in Ireland.  Id. at 369.  Throughout this opinion, we will sometimes refer to the companies collectively as "Koger."

4

had backdated the KPS certificate to December 31, 2004.  Id. at 371 (alteration in original).

Robert resigned from Koger on March 10, 2006 and remained estranged from his family.  Id. at 372.  Later that year, at a board meeting, George purportedly recalled Robert's 1.5% interest in Koger effective the date of his resignation.  Ibid.  Robert eventually filed suit.

In its January 2009 decision, the trial court found "Robert's testimony to be more compelling than that of George and Ras with respect to George's gift of 1.5% of Koger stock . . . [and] held that the gift was unconditional and effective." Id. at 373.   However, rejecting Robert's oppressed shareholder claim, the court denied his request for a buyout of his interest in Koger and, as a result, Robert remained a 1.5% shareholder in the company.  Ibid.  Regarding KDS and KPS, the trial judge held that the companies "had no value as distinct companies and that the contracts in those companies' names were, in reality, Koger contracts dependent upon the licensing of Koger products[,]" and that Robert recognized "that his interests in KDS and KPS had no value, [and] voluntarily surrendered those interests, probably in February 2006."  Ibid.

On appeal, we reversed the trial court's finding that George's gift of Koger stock to Robert was unconditional, "deeming it unsupported by the evidence."

A-0495-16T2

Id. at 374. We also reversed the trial court's decision regarding Robert's surrender of his stock interests in KDS and KPS, finding the transfer lacked consideration. Ibid. Our May 2011 judgment resulted in Robert's reinstatement as a 50% shareholder in KPS and KDS. The Court granted certification "limited to the question[s] of whether George's gift of Koger stock was conditioned on Robert's continued employment at Koger[,] . . . [and] whether Robert retain[ed] his holdings in KDS and KPS." Id. at 374 (citation omitted).

The Court issued its decision in July 2013. Regarding the first issue, the Court reversed our judgment, reinstated the trial court's holding that George's gift of Koger stock was unconditional, and restored Robert's 1.5% interest in Koger. Id. at 377–78. The Court's resolution of the second issue, and the result of its remand to the trial court, form the backdrop for the present appeals.

As a preliminary matter, the Court concurred with our judgment that the trial court's finding that KDS and KPS lacked any value "was not supported by the evidence." Id. at 379. It noted that, in 2006, both companies had substantial revenue, and, at trial, Robert presented the testimony of an expert, Hubert Klein, who valued KDS at $1,547,278, and KPS at $34,973,236, at the time Robert filed his complaint. Ibid. The Court noted that defendants failed to rebut those valuations, and, instead "instructed their valuation expert not to separately

A-0495-16T2

calculate the value of the two companies." Ibid. The Court held "the trial court's conclusion that KDS and KPS were devoid of value cannot be sustained. Instead, . . . Robert's interests in KDS and KPS clearly had value, which was not quantified by the factfinder." Id. at 380. The Court concurred with our conclusion that "substantial credible evidence support[ed] a finding the transactions lacked consideration, and are therefore void. . . . Robert did not relinquish his interests in KDS or KPS." Id. at 381.

The Court then addressed the issue of "fashioning an appropriate remedy[,]" which was "complicated by the procedural posture of th[e] case." Ibid. It observed that the trial court had treated Koger, KDS, and KPS as a single entity, and, upon concluding Robert failed to prove shareholder oppression, dismissed his request to rescind the stock transfers for lack of consideration, Robert's claim that George and Ras breached their fiduciary duties, and Robert's demand for an accounting. Id. at 381–82. The Court "require[d] the trial court to reinstate all of Robert's enumerated claims as they relate to KDS and KPS, and to consider those claims on their merits." Id. at 382.

The Court expressly left intact the trial court's and our determination that Robert failed to demonstrate shareholder oppression. Ibid. Nonetheless, it held that "a minority shareholder's failure to demonstrate conduct that rises to the

7

level of oppression does not necessarily deprive him of a remedy[,]" because the oppressed shareholder statute, N.J.S.A. 14A:12-7(1)(c), "does not limit the equitable power of the courts to fashion remedies appropriate to an individual case." Id. at 382–83 (citing Brenner v. Berkowitz, 134 N.J. 488, 512, 514 (1993)).[3] Accordingly, the Court also remanded "for consideration of what, if any, remedy is appropriate." Id. at 383. It held, "[T]he trial court has broad discretion to consider such statutory and equitable remedies as may be appropriate to this setting, including but not limited to an accounting of the income and expenditures of KDS and KPS." Id. at 383–84 (emphasis added).

## The Remand and Entry of Judgment

Within weeks of the Court's decision, the trial judge conducted a hearing and the parties staked out their positions. Robert argued he was entitled to a buyout of his 50% interests in KDS and KPS in an amount based on the expert valuations at trial, or, alternatively, he requested an accounting. Defendants argued Robert was only entitled to a return of his 50% interests in the two companies.

---

[3] Under the statute, a 50% shareholder in a corporation may be deemed a minority shareholder, "[b]ecause a [50%] shareholder cannot direct outcomes as a 51% shareholder can, [and] he does not have 'control' of the corporation." Sipko, 214 N.J. at 382 n.7 (quoting Balsamides v. Protameen Chems. Inc., 160 N.J. 352, 371 n.7 (1999)).

A-0495-16T2

After considering the parties' briefs and oral argument, the judge issued a written decision. He noted that the Court's conclusion that Robert's stock transfers were void meant as a matter of law that he "never ceased being a [50%] owner." The court declined Robert's request for a buyout of his interests in KDS and KPS because Robert had failed to identify oppression, fraud, illegality, mismanagement, or misconduct by the defendants. However, the court agreed that an accounting was appropriate, after which it would reconsider the buyout remedy. The accounting was to include "all revenues and distributions, assets and liabilities of both KDS and KPS, [from] January[] 2006 to the present, and including an accounting of the use and disposition of all assets, including contracts, for that time period."

The judge also revisited the alleged backdating of the surrendered KPS stock certificate, noting that he reached no conclusion after trial about the circumstances because he had determined the stock in both companies lacked any value. However, because the Court recognized that KDS and KPS had independent value, he intended to reconsider the issue. Based on the trial evidence, the judge concluded that Ras backdated the certificate, or caused someone else to backdate it, and intended to deprive Robert of the economic benefits of his KPS ownership interests between December 2004 (the misdated

date of transfer) and February 2006, when Robert acknowledged his surrender of the shares. Despite this finding of misconduct, the judge did not conclude immediately that it justified a buyout. He ordered Ras to conduct an accounting of the two companies.

The accounting Ras produced was, to say the least, revealing. Although KDS had entered into licensing agreements with third parties in the interim, one contract was assigned to Koger and the others essentially lapsed without renewal. According to the accounting, KDS entered no new contracts thereafter and filed a certificate of dissolution in June 2009. As to KPS, the accounting revealed it had entered a number of new contracts with third parties in 2005 and 2006; several were assigned thereafter to Koger and others terminated or were not renewed.[4] KPS entered no new agreements after 2007.

After receiving the accounting, Robert submitted a report prepared by Withum, Smith & Brown, PC, an accounting firm, authored by one of its partners, William J. Morrison. The report analyzed the revenues earned by the two companies. KDS earned $447,749 in revenue in 2005, and $455,925 in

---

[4] In his written opinion following trial, the judge wrote that prior to his departure in 2006, "Robert was a foundation pillar in the Koger enterprises. The nature and extent of his very significant contributions were established during the trial. . . . It was unclear whether the company would even survive his departure."

2006, but nothing thereafter. KPS earned $5,149,575 in revenue in 2006, $8,994,899 in 2007, and $8,086,147 in 2008; however, in 2009, KPS earned less than $200,000, and in 2010, less than $100,000. The report determined that the companies' revenues declined dramatically after "certain clients were assigned or 'transferred' to Koger," and concluded that substantial KPS revenue streams were diverted to Koger in the midst of the litigation.

Defendants submitted their rebuttal report, prepared by the accounting firm of Wilkin & Guttenplan, PC. The report criticized Morrison's analysis and asserted that because all of KDS's and KPS's clients originally came from Koger, the companies were "not viable businesses without the discretionary grace bestowed upon them by Koger" to use its intellectual property. Wilkin provided no alternative valuation of KDS and KPS.

After again considering oral argument, the judge issued his final decision on July 27, 2016. He explained that the accounting was ordered to ascertain what happened to the "exceedingly valuable contracts" held by KDS and KPS. The issue the court sought to resolve was: "[W]hat remedy if any is . . . Robert . . . entitled to beyond the post-remand, court-ordered accounting[?]" Echoing the Court's determination that KDS and KPS were distinct legal entities with independent value and substantial revenues at the time Robert filed his

11

complaint, the judge concluded that Ras and George acted in concert to "shield from recovery . . . any value [Robert] might achieve in the litigation" by transferring licensing contracts from KPS and KDS to Koger and, that, beginning in 2008, "Ras and George caused KPS contract revenue to flow to Koger." The judge concluded that Ras's backdating of the KPS stock certificate was "an effort to deprive Robert of the value of his interest in KPS attributable to certain contracts negotiated by Robert in 2005, which began to yield rich fruit in 2006." The judge found defendants' actions decreased the value of Robert's property and were unlawful, as the transfers were done "in complete derogation of corporate formalities" and with the "specific purpose of shielding value from Robert[] and absorbing it into Koger."

The judge rejected Ras's explanation that the value of KDS and KPS decreased because of Robert's voluntary departure. He also rejected George's explanation that he could "do whatever he liked with KDS and KPS" because he controlled Koger. The court found that, although George exercised de facto control over KDS and KPS, he had no ownership interest in them.

The judge rejected defendants' assertion that the Court limited Robert's remedy on remand to the return of his 50% interests in KDS and KPS. According to the judge, "Seen in the light of the post-remand record, it is clear

that value has been deliberately diverted by Ras and George precisely to put it beyond Robert's reach. Equity cannot abide that." The judge wrote, "The undisclosed assignment of assets, the redirect of contract revenues, the backdating of the stock certificate, the misrepresentation and nondisclosure of assets in the KDS account at the time of the original trial, properly require a remedy."

Because KDS and KPS were essentially worthless, the judge determined a third-party sale or forced dissolution of the companies would be empty remedies. Therefore, the judge concluded that the "only appropriate available remedy" was to impose a buyout obligation upon defendants and order them to pay Robert the value of his 50% interest in KDS and KPS as of the date Robert filed the complaint. The judge accepted the unrebutted opinion Klein offered at trial, noting the court's "post-remand invitation to the defense to consider another expert was rebuffed."

The judge concluded, "Robert's value [was] not zero. No alternative but zero has been put forth by the defense." The judge determined Robert's 50% interests in KDS at the date of valuation was $773,642, and his 50% interest in KPS as of that date was $17,486,618, i.e., 50% of Klein's valuations. The court

13

imposed the obligation upon Ras as the remaining shareholder, and upon George and Koger, as the beneficiaries of Robert's interests in KDS and KPS.

Following hearings to settle its form, the court's August 19, 2016 judgment awarded Robert damages against KPS, KDS, George, Ras, and Koger, jointly and severally, for $24,697,571.14, which included pre-judgment interest. The court imposed a constructive trust on Koger's profits and enjoined Koger, George, and Ras from transferring any assets until full satisfaction of the judgment or the posting of an appropriate bond. The judge stayed execution on the judgment for thirty days to permit the posting of a supersedeas bond pending appeal.

The judge denied defendants' motion for reconsideration and to post alternative security for a stay pending appeal by order dated September 26, 2016. Defendants filed their appeal (A-0495-16).

Events following Entry of Judgment

Defendants then filed an application on short notice to post alternative security, supported by certifications from George and Ras proposing to post their entire 98.5% interest in Koger. Additionally, Ras offered to post $3 million in cash and real property in Connecticut that he valued at $6.75 million. On September 30, 2016, the judge entered an order granting the posting of this

14

alternative security, conditioned upon defendants providing a sworn accounting of assets and liabilities, foreign and domestic. The order also provided that if the court found, "after notice and hearing," any material misrepresentation in the sworn accounting, it would forfeit defendants' posted cash, deed, and stock in partial satisfaction of the judgment and vacate the stay.[5] Finally, the court ordered defendants to provide "audited financial statements within 100 days," and enjoined them from encumbering, secreting, or transferring any assets outside the ordinary course of business.

On October 28, 2016, defendants submitted unaudited financial statements, in which the accounting firm noted that defendants did not ask it to verify the accuracy or completeness of the information provided by defendants. The accountants noted that defendants "elected to omit substantially all the disclosures ordinarily included in the statement of financial condition prepared in accordance [with] generally accepted accounting principles." The financial disclosures contained no backup documentation and asserted that George had a total net worth of $44,051,100, and Ras's net worth was $21,729,700.

On November 7, the court granted Robert's request to appoint a special fiscal agent (SFA) to oversee Koger. In an oral decision, the judge said that the

---

[5] A subsequent corrective order added other New Jersey properties as security.

A-0495-16T2

appointment was not based upon any finding of misconduct by defendants or misrepresentation in their disclosures. However, because defendants intended to post alternative security, it was appropriate to appoint an SFA so information regarding the true value of the Koger stock pledge would be available.

Robert moved for further relief, which the court partially granted in its December 13, 2016 order. Noting that defendants had yet to post the Koger stock or the real properties as security, and their continued "inability or refusal to cooperate," the judge ordered the Koger stock and the properties be immediately pledged to the SFA's satisfaction. He also required that defendants supply documents supporting the financial statements previously furnished to the court. Additionally, the order required defendants to file within thirty days a sworn accounting of transactions by Koger which exceeded $50,000, and any by George or Ras that exceeded $10,000, from September 30, 2015, through November 30, 2016 (the look-back accounting).

While motion practice continued, defendants filed the look-back accounting with the SFA on January 13, 2017. It revealed that George and Ras had transferred approximately $20 million in cash to overseas accounts in a series of transactions between July 28, 2016 — one day after the judge issued his final decision on remand — and August 11, 2016, approximately one week

before entry of judgment. According to the accounting, these transfers were made to satisfy loan obligations incurred by George and Ras.

Robert filed an order to show cause, certifying those named as recipients of the transfers were George's sister, nephew and the wife or daughter of George's brother-in-law. He asserted the purported purpose of the transfers was a sham, and the true intent was to thwart Robert's ability to collect on the judgment. He identified other wire transfers in the accounting for approximately $2 million that were unexplained.

George and Ras filed a cross-motion, in which they sought a hearing as to the fair market value of the security they had posted. Ras also claimed that only $3 million of the transfers were made by him, and he provided details alleging the payments were made on account of loans he and George obtained to purchase properties in Slovakia, and to preserve those properties as assets to satisfy the judgment if necessary. Ras explained that full repayment of $17 million on one loan was due in August 2016. In his certification, George confirmed these details and attempted to explain the additional $2 million in transfers shown in the accounting.

The judge heard oral argument on these pending applications and issued an order and written decision on February 13, 2017. Among other things, based

17

upon defendants' admitted transfer of money overseas immediately following the decision on remand, the judge vacated the stay and ordered the forfeiture of the $3 million and New Jersey properties previously posted as security. The order imposed a constructive trust on George's and Ras's "assets and income," and awarded Robert counsel fees. In a corrected order filed February 28, the court added Ras's Connecticut property to the list of forfeited assets.

George and Koger filed an appeal from these post-remand orders (A-3128-16), and Ras filed a separate appeal (A-3129-16).

Robert subsequently moved to dismiss George's and Koger's appeals based on the fugitive disentitlement doctrine (FDD), see, e.g., Matsumoto v. Matsumoto, 171 N.J. 110, 128–29 (2002), citing the remand court's conclusion that George fled the jurisdiction after secretly diverting assets overseas to frustrate Robert's ability to collect on the judgment, and the court's threat of imprisonment unless the assets were returned.[6] On February 14, 2020, we granted Robert's motion to dismiss George's appeal in A-0495-16 pursuant to the FDD, however, we denied Robert's motion to dismiss the appeal as to Koger,

---

[6] After ordering George and Ras to return the monies diverted overseas or face incarceration, the trial court issued a warrant for George's arrest on July 18, 2018, after he failed to appear in court for a hearing.

which remains an on-going business under the SFA's stewardship. The Supreme Court denied George's motion seeking leave to appeal our order on an interlocutory basis. ___ N.J. ___ (2020).

Thus, in A-0495-16, the appeal proceeds only as to Ras and Koger. The effect of our order dismissing George's appeal is that some of the specific arguments raised in the joint brief filed by George and Koger are no longer before us, because they dealt with contentions that relate solely to George and sought relief personal to him.

George and Koger consented to dismissal of A-3128-16, and we entered an appropriate order dismissing the appeal.[7] As a result, we only consider the issues Ras raises in A-3129-16.

As to A-0495-16

I.

Koger and Ras both argue that the judge abused his discretion by expanding the scope of the remand ordered by the Court. Koger also contends that the judge's order to provide an accounting of KPS's and KDS's assets improperly considered events that occurred years after trial, and that Robert

---

[7] Robert also sought to dismiss two other appeals brought by George and Koger based on the FDD, A-0666-17 and A-1960-17. They consented to the dismissal, and we entered appropriate orders dismissing those appeals.

should have been required to file a new complaint if he was alleging post-trial conduct justified relief beyond restoration of his 50% interests in KPS and KDS. Both Koger and Ras argue that, at the least, the judge was required to hold an evidentiary hearing before concluding that the companies willfully transferred assets to Koger to avoid Robert's reach. We disagree.

Initially, the Court specifically reinstated certain "enumerated claims" in Robert's complaint, including his claim that "George and Ras breached their fiduciary duties" and "his demand for an accounting of income streams and disbursements relating to KDS and KPS during the relevant years to which he may be entitled recompense . . . ." Sipko, 214 N.J. at 382. The Court concluded that Robert's surrender of his stock in the two companies was void for lack of consideration and ordered the judge on remand to "determin[e] . . . Robert's claims . . . and . . . consider[] . . . what, if any, remedy is appropriate[,]" citing the judge's "broad discretion to consider such statutory and equitable remedies as may be appropriate . . . including but not limited to an accounting of the income and expenditures of KDS and KPS." Id. at 383–84 (emphasis added). The remand court's August 2014 order requiring Ras to conduct an accounting of both companies was entirely consistent with the Court's remand. Moreover, at the first hearing on remand, as stated by their counsel, defendants did not

20

object to producing "whatever financial statements [Robert] want[s] from these two companies[.]"

The accounting demonstrated that simply restoring Robert's interests in KDS and KPS was not a meaningful remedy. We fail to see the merit of Koger's argument that the judge was somehow forbidden from fashioning an appropriate remedy if it relied on defendants' post-trial conduct. We discuss the court's broad equitable powers below.

Both Koger and Ras argue that the judge was required to hold an evidentiary hearing before he could determine they illegitimately diverted revenue streams from KPS and KDS to Koger with the purpose to hollow out the companies' values. Robert argues that no one asked for additional testimony or discovery, particularly since defendants' asserted position was that a buy-out was inappropriate in the absence of shareholder oppression, and Robert was only entitled to his 50% interest in the two companies "going forward."

Defendants' arguments regarding the trial court's refusal to conduct discovery or hold a plenary hearing lack any citation to the record. We note that in his letter decision denying defendants' motion for reconsideration, where the argument was made as a basis for relief, the judge said that he never denied a request to depose Klein, plaintiff's trial expert, and was "unaware of any request

to depose [Morrison,] and the court . . . never denied any request to depose that expert or any expert."

However, after Robert furnished Withum's report in response to Ras's accounting, defendants did request to take Morrison's deposition. The judge denied the request without prejudice, since defendants intended to furnish their own report, i.e., the report from Wilkin & Guttenplan. Nothing in the record indicates defendants ever renewed the request.

Regarding other discovery, we note that during the July 11, 2013 hearing, which was the first hearing on remand, defense counsel argued that the only remedy Robert was entitled to, if any, was restoration of his 50% interest in KDS and KPS and dissolution of both companies.[8] When the judge mused, "we know the bones have been picked, so that really it will just lead into a fraudulent conveyance type case[.]" Counsel replied "[t]hen we need to take discovery, because our position is that distributions and income and expenses were made

---

[8] During the remand leading up to judgment, all defendants were represented by the same counsel, who is George's and Koger's appellate counsel. Ras had separate counsel during some of the post-judgment hearings, appeared pro se in some, and has separate counsel on appeal.

at a time when there was no lawsuit and there was a resignation and . . . a give back of stock."[9]

We found no other request by defendants for discovery, nor has any been cited to us. The transcript of a hearing held on May 5, 2015, reveals that both counsel signaled their agreement that no further discovery was necessary and each would brief and argue their positions as to what remedy, if any, was appropriate.

In his letter opinion denying the motion for reconsideration, the judge stated:

> [T]he parties advised the court that the discovery aspects of the case were concluded, and that the court would be presented the matter for post-remand decision based on the parties' written submissions and the argument of counsel. That is exactly what occurred. The court did not preclude a testimonial hearing; the parties, through their counsel, elected not to have one.

Defendants fail to cite anything in the record to refute the judge's characterization of the procedural aspects of the remand hearing. We therefore reject the claim that defendants were denied additional discovery or an evidentiary hearing prior to the court's entry of judgment.

---

[9] This is the only support in the record that we could find for Koger's claim that Robert had to file a new lawsuit to obtain relief based on the post-trial transfers.

Koger and Ras both argue that the judge erred by concluding the post-trial transfer of assets from KDS and KPS to Koger and payments made by those companies to Koger were improper. Koger cites trial testimony from Robert that reflected his belief that the two companies totally relied on Koger's willingness to allow the use of Koger licenses, and that both were essentially shell companies beholden to Koger's beneficence. It cites to the court's findings following trial that support these conclusions. Koger further contends that without holding a hearing, the judge made credibility findings, rejecting legitimate business reasons for the transfers proffered in certifications filed by George and Ras.[10]

Our standard of review of the factual findings and legal conclusions of the trial judge following a non-jury trial is as follows:

> Final determinations made by the trial court sitting in a non-jury case are subject to a limited and well-established scope of review: "we do not disturb the factual findings and legal conclusions of the trial judge unless we are convinced that they are so manifestly unsupported by or inconsistent with the

---

[10] Ras posits the argument by claiming the judge's conclusion was "contrary to the weight of the evidence." Rule 2:10-1 provides: "In both civil and criminal actions, the issue of whether a jury verdict was against the weight of the evidence shall not be cognizable on appeal unless a motion for a new trial on that ground was made in the trial court." (Emphasis added). A challenge to a verdict as being against the weight of the evidence is inapplicable to a bench trial. Fanarjian v. Moskowitz, 237 N.J. Super. 395, 406 (App. Div. 1989).

competent, relevant and reasonably credible evidence as to offend the interests of justice[.]"

[Seidman v. Clifton Sav. Bank, SLA, 205 N.J. 150, 169 (2011) (alteration in original) (quoting In re Trust Created By Agreement Dated December 20, 1961, ex. rel. Johnson, 194 N.J. 276, 284 (2008)).]

After his review of the accounting filed by Ras, Morrison's expert report, and Wilkin & Gutteplan's expert report, there was ample evidence to support the judge's conclusions that the post-trial conduct of KDS and KPS was in stark contrast to their prior business conduct and stripped the companies of all value to Koger's benefit.

For example, according to Morrison's report, several contracts with KPS remained in place after the litigation commenced. The judge found that the contracts were automatically renewable by KDS and KPS. But, whereas KPS received substantial income from those contracts in the past, it received no revenue from them in 2009 and 2010. At the same time, the accounting revealed substantial invoices from Koger to those same clients.

The judge also found that there was no legitimate justification for a sudden and complete diversion of revenue streams. The asserted position that these clients were previously Koger's clients anyway was not an adequate explanation or justification for the change or its timing. Regarding defendants' intention, the

judge relied heavily on the backdating of Robert's KPS stock surrender, noting the issue was somewhat irrelevant at the time of trial because he had found both companies to be worthless. However, on remand, the judge properly followed the Court's instructions, accepting, as he was required to do, that both companies had value and that Robert was, and remained, a 50% owner of both.

As a corollary argument, defendants argue that the unilateral transfer of licensed assets from the two companies to Koger was consistent with the judge's findings following trial, i.e., that KDS and KPS had no independent value. Therefore, any transfers could not have been made with an intent to devalue the two companies. However, some of the license transfers occurred after Robert filed his complaint and before the trial court's initial decision. Others occurred after Robert filed an appeal, specifically contesting the transfer of his interests in KDS and KPS because it lacked consideration.

In his final decision on remand, the judge initially rejected defendants' assertion that this conduct was "shielded by the business judgment rule." The business judgment rule "protects a board of directors from being questioned or second-guessed on conduct of corporate affairs except in instances of fraud, self-dealing, or unconscionable conduct." In re PSE&G S'holder Litig. v. Codey, 173 N.J. 258, 276–77 (2002) (quoting Maul v. Kirkman, 270 N.J. Super. 596,

614 (App. Div. 1994)).  The rule is a rebuttable presumption.  Id. at 277.  A challenger must initially demonstrate a corporate decision evidenced the decision-maker's "self-dealing or other disabling factor."  Ibid. (quoting Maul, 270 N.J. Super. at 614).  Upon rebutting the presumption, the burden shifts to the decision-maker "to show that the transaction was, in fact, fair to the corporation."  Ibid. (citations omitted).

The judge found Ras's claim that Robert's departure required these abrupt deviations from the established practices of KDS and KPS regarding contracts with clients, and the revenue stream from those contracts, was "unsubstantiated." Ras initially asserted that he could no longer operate the two businesses alone and chose, instead, to "out-source[]" the work to Koger. However, the judge noted that this outsourcing in some cases preceded actual assignments of the licenses to Koger "in complete derogation of corporate formalities."  The judge rejected George's claim that he "could do whatever he liked with KDS and KPS" as "legally untenable."  In his written final decision on remand, the judge rejected defendants' assertion of the business judgment rule, concluding it could not be used to "shield" their conduct regarding KDS and KPS "where it has the direct effect of enriching some family members at the direct expense of one family member."

27

Defendants raised the argument again in their motion for reconsideration, which was supported by Ras's extensive certifications that provided some details regarding the transfer of these assets. The judge refused to consider the certifications. In his written decision supporting the order denying reconsideration, the judge quite correctly noted that defendants engaged in "an improper attempt to augment the agreed upon record with purported facts which should or easily could have been put forth" before.

It is axiomatic that "the decision to grant or deny a motion for reconsideration rests within the sound discretion of the trial court." Pitney Bowes Bank, Inc. v. ABC Caging Fulfillment, 440 N.J. Super. 378, 382 (App. Div. 2015). Reconsideration

> is not appropriate merely because a litigant is dissatisfied with a decision of the court or wishes to reargue a motion, but
>
> > should be utilized only for those cases which fall into that narrow corridor in which either 1) the Court has expressed its decision based upon a palpably incorrect or irrational basis, or 2) it is obvious that the Court either did not consider, or failed to appreciate the significance of probative, competent evidence.
>
> [Palombi v. Palombi, 414 N.J. Super. 274, 288 (App. Div. 2010) (quoting D'Atria v. D'Atria, 242 N.J. Super. 392, 401 (Ch. Div. 1990)).]

A-0495-16T2

"Alternatively, if a litigant wishes to bring new or additional information to the Court's attention which it could not have provided on the first application, the Court should, in the interest of justice (and in the exercise of sound discretion), consider the evidence." Cummings v. Bahr, 295 N.J. Super. 374, 384 (App. Div. 1996) (quoting D'Atria, 242 N.J. Super. at 401–02).

Trial courts may also refuse to consider such certifications when the "factual predicates" of a party's "new theory" were available before the court's initial decision. Ibid. We have not hesitated to affirm denials of reconsideration by the trial court where premised upon evidence that the moving party could have produced earlier. Palombi, 414 N.J. Super. at 289 (citing Del Vecchio v. Hemberger, 388 N.J. Super. 179, 188–89 (App. Div. 2006)).

Koger and Ras do not explicitly challenge the judge's decision not to consider the certifications. We find no abuse in the judge's exercise of his discretion to deny reconsideration. The Court remanded the case in 2013. The judge held the first hearing on remand within weeks of the decision. Defendants had ample opportunity to explain any purported legitimate business reason for the transfers well before the judge's July 2016 written decision, but they offered only the ones noted by the judge in that decision.

In sum, there was ample support for the judge's conclusion that defendants diverted revenue from KDS and KPS with a purpose to shield the assets of those corporations from Robert's reach. We reject both the procedural and substantive challenges to that finding.

## II.

Koger argues Robert was not entitled to a buyout remedy because he failed to prove shareholder oppression, a finding by the trial court that was left undisturbed by our judgment and the Court's decision.[11] Koger cites N.J.S.A. 14A:12-7(1)(c), which provides for the court-ordered sale of stock in a corporation having twenty-five or less shareholders when "the directors or those in control have acted fraudulently or illegally, mismanaged the corporation, or abused their authority as officers or directors or have acted oppressively or unfairly toward one or more minority shareholders[.]" However, the trial judge did not rely on the statute in fashioning his remedy.

Robert's amended complaint sought to rescind the 2006 transfer of his stock in the two companies because it lacked consideration. The Court affirmed our holding that the transfers were void, thereby affirming that Robert was

---

[11] Ras makes no argument that the buyout remedy was unavailable to the remand judge. "An issue not briefed on appeal is deemed waived." Sklodowsky v. Lushis, 417 N.J. Super. 648, 657 (App. Div. 2011).

entitled to an appropriate remedy. Sipko, 214 N.J. at 381. The judge never relied on the statute in ordering the buyout, nor was relief on remand limited by the lack of a finding of shareholder oppression. Id. at 383 (noting despite the failure to prove oppression, "a broad range of remedies" remained available, and the statute did "not limit the equitable power of the courts to fashion remedies appropriate to an individual case" (citing Brenner, 134 N.J. at 512, 514–15)).

After Ras furnished the accounting, and after the judge considered the reports from each side, he faced a dilemma. Since the value of Robert's 50% interests in KDS and KPS had been "absorbed into Koger," what additional remedy, if any, was appropriate under the circumstances? The judge concluded merely restoring Robert's shares was "an intolerable result." He therefore ordered the purchase of Robert's 50% interest in both companies, valued as of the date of trial.

Koger argues this was an abuse of the judge's equitable powers and, in the absence of a finding of shareholder oppression, it exceeded any remedy suggested by the Court's reference to Brenner. We disagree.

In Brenner, the Court held that N.J.S.A. 14A:12-7 provides remedies for corporate misconduct that does not rise to the level of shareholder oppression. 134 N.J. at 506–07. The Court emphasized that the statute provides a court with

broad discretion in fashioning an appropriate remedy to address the misconduct, beyond dissolution of the corporation, which is "an extreme remedy to be imposed with caution[.]" Id. at 510–11. The Court held that while N.J.S.A. 14A:12-7(8) only authorized a voluntary stock buy out, "in appropriate circumstances a court exercising its equitable powers, as an alternative to dissolution, could compel the purchase of a shareholder's stock by the corporation; under exceptional circumstances, the court's equitable power might encompass the power to compel an involuntary buy-out by the other shareholders." Id. at 513. Contrary to Koger's contention, neither the statute nor the Court's decision limited the remand court's equitable powers to fairly restore Robert to his rightful ownership share of the two companies.

The immediate remedy available on remand was, of course, rescinding the 2006 stock transfers, one specific claim for relief pled in Robert's complaint. "Rescission is an equitable remedy" and, for it to be available, "[t]he court must be able to return the parties to the 'ground upon which they originally stood.'" Intertech Assocs., Inc. v. City of Paterson, 255 N.J. Super. 52, 59 (App. Div. 1992) (quoting Hilton Hotels Corp. v. Piper Co., 214 N.J. Super. 328, 336 (Ch. Div. 1986)); see also Am. Container Corp. v. Hanley Trucking Corp., 111 N.J. Super. 322, 334 (Ch. Div. 1970) ("The law is clear that a rescission contemplates

a return to <u>status quo ante</u>." (citing <u>Medivox Prods., Inc. v. Hoffmann-LaRoche, Inc.</u>, 107 N.J. Super 47, 75–76 (Law Div. 1969))). Under the facts presented here, rescission alone was an inequitable remedy.

We have said that "a judge sitting in a court of equity has a broad range of discretion to fashion the appropriate remedy in order to vindicate a wrong consistent with principles of fairness, justice, and the law." <u>Graziano v. Grant</u>, 326 N.J. Super. 328, 342 (App. Div. 1999). "[A] court's equitable jurisdiction provides as much flexibility as is warranted by the circumstances[.]" <u>Matejek v. Watson</u>, 449 N.J. Super. 179, 183 (App. Div. 2017). "[A] court of equity should not permit a rigid principle of law to smother the factual realities to which it is sought to be applied." <u>Graziano</u>, 326 N.J. Super. at 342 (citing <u>Grieco v. Grieco</u>, 38 N.J. Super. 593, 598 (App. Div. 1956)). "Equity will not permit a wrong to be suffered without affording the appropriate remedy." <u>Ibid.</u> Most importantly for our purposes, "[d]ecisions concerning [the application of an equitable doctrine] ordinarily are left to the sound discretion of the trial court. 'An appellate court should not substitute its judgment for that of the trial judge unless there is a showing of clear abuse of that discretion.'" <u>Feigenbaum v. Guaracini</u>, 402 N.J. Super. 7, 17 (App. Div. 2008) (second alteration in original) (quoting <u>Kurzke v. Nissan Motor Corp. in U.S.A.</u>, 164 N.J. 159, 165 (2000)).

33

The remand judge did not abuse his discretion in ordering the forced buyout of Robert's interests in the two companies. There was no other equitable remedy in light of the court's findings and conclusions regarding defendants' conduct, which, as noted above, were amply supported by the record.

## III.

Koger challenges the entry of judgment holding it jointly and severally liable.[12] In his written decision supporting the judgment, the judge reasoned that George and Koger were "beneficiaries of the value of Robert's interests in KDS and KPS, of which he would otherwise be deprived." After oral argument considering the form of judgment, the judge noted defendants' continued claim that KDS and KPS were "shells" and essentially worthless. He reiterated that "the other defendants . . . received the benefit of that which had not gone to . . . Robert[.]"

Essentially, the judge concluded Koger had been unjustly enriched by the diversion of assets. "To establish unjust enrichment, a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust." VRG Corp. v. GKN Realty Corp., 135 N.J. 539, 554

---

[12] Much of the argument challenges George's personal liability for the judgment. For reasons already explained, we do not address the issue.

A-0495-16T2

(1994) (citing Assocs. Commercial Corp. v. Wallia, 211 N.J. Super. 231, 243 (App. Div. 1986)). "A person who is unjustly enriched at the expense of another is subject to liability in restitution." Restatement (Third) of Restitution and Unjust Enrichment § 1 (Am. Law Inst. 2011). Under certain circumstances, a third party unjustly enriched by the diversion of assets may be held legally responsible for restitution. Id. at § 47 ("If a third person makes a payment to the defendant in respect of an asset belonging to the claimant, the claimant is entitled to restitution from the defendant as necessary to prevent unjust enrichment.").

For reasons already discussed, the judge's conclusion that Koger was the recipient of the wrongfully diverted assets of KDS and KPS is supported by the record. We therefore reject the argument that Koger could not be held jointly and severally liable for the judgment.

## IV.

Koger contends that the judge erred in awarding pre-judgment interest. "[T]he award of prejudgment interest on contract and equitable claims is based on equitable principles." Cty. of Essex v. First Union Nat'l Bank, 186 N.J. 46, 61 (2006) (citing Pressler, Current N.J. Court Rules, cmt. 9 on R. 4:42-11 (2006)). The "primary consideration" in awarding prejudgment interest is that

> the defendant has had the use, and the plaintiff has not, of the amount in question; and the interest factor simply covers the value of the sum awarded for the prejudgment period during which the defendant had the benefit of monies to which the plaintiff is found to have been earlier entitled.
>
> [Litton Indus., Inc. v. IMO Indus., Inc., 200 N.J. 372, 390 (2009) (quoting Rova Farms Resort, Inc. v. Inv'rs. Ins. Co., 65 N.J. 474, 506 (1974)).]

"The allowance of prejudgment interest is a matter of discretion for the trial court." Cty. of Essex, 186 N.J. at 61 (citing In re Estate of Lash, 169 N.J. 20, 34 (2001)). "Unless the award 'represents a manifest denial of justice,' an appellate court should not interfere." Ibid. (quoting Musto v. Vidas, 333 N.J. Super. 52, 74 (App. Div. 2000)).

Here, the judge awarded more than $6.4 million in interest on the buyout of Robert's shares. The judge found it was "just fair that if you're awarded something based upon a value fixed in time that you haven't had, that you get an interest factor built into that."[13] The judge's reasoning was consistent with the Court's reasoning in Rova Farms. Had Ras provided consideration for Robert's transfer of his 50% interests, Robert would have enjoyed the benefits of the

---

[13] The judge specifically clarified that the prejudgment interest award was not predicated upon N.J.S.A. 14A:12-7(8)(d), which permits, in a voluntary stock buyback, that the court may order interest "at the rate and from the date determined by the court to be equitable[.]"

A-0495-16T2

money for more than a decade. Instead, not only did Robert lack the money during that time, but also during that same period, Ras and George took actions that resulted in the devaluation of Robert's interests. We have already addressed Koger's arguments that any devaluation of KDS and KPS resulted from valid business judgments, or that it did not benefit from monies diverted from Robert. As to Koger's claim that the amount of the award renders it inequitable, we address that derivatively below.

V.

Koger and Ras challenge the judge's valuation of Robert's interests in KDS and KPS. As noted, on remand, with neither party seeking to offer any additional evidence on the valuation of the two companies other than what was presented at trial, the judge accepted Klein's opinions and entered judgment. Consideration of defendants' arguments requires us to recount some of the trial testimony.

Klein testified that he applied the income-based and market-based methods of valuation, not an asset-based method of valuation, and considered factors listed in the Internal Revenue Service (IRS), Revenue Ruling 59-60, C.B.

1959-1.[14]    After weighting and adjustment, Klein concluded that, as of November 12, 2007, when Robert filed his initial complaint, KDS had fair value of $1,547,278, and KPS had fair value of $34,973,236, and the fair value of Robert's ownership was 50% of those amounts.[15]

In his written opinion following the 2008–09 trial, although the judge never explicitly rejected Klein's opinions, he implicitly did so because he found, among other things, that neither KDS or KPS "ever had any measurable value apart from Koger . . . . They were created and operated for the estate planning and liability-shielding benefits that might accrue, but had no viability or purpose or value as distinct entities." The judge rejected Robert's claim that his transfer of 50% interest in the companies was void for lack of consideration, "because [he found] that neither of those two entities had value at the time Robert

---

[14]  In Balsamides, the Court recognized this IRS ruling as "the key reference regarding valuation of closely held companies[.]" 160 N.J. at 374 n.8.

[15]  Defendants do not challenge the court's decision to accept Klein's valuation date as the commencement of the litigation. Appellate courts review the determination of a valuation date under the abuse of discretion standard. Torres v. Schripps, Inc., 342 N.J. Super. 419, 437 (App. Div. 2001). Nothing suggests the court abused its discretion. The chosen valuation date is consistent with N.J.S.A. 14A:12-7(8)(a), governing voluntary court-ordered purchases of stock, which provides the court may order the sale of shares valued at "their fair value as of the date of the commencement of the action or such earlier or later date deemed equitable by the court[.]"

surrendered his interests[.]" Of course, the Court rejected that underlying conclusion. Sipko, 214 N.J. at 380.

On remand, the judge observed that at trial, defendants failed to "put forth any approach to value which recognize[d] the existence of KDS or KPS as corporations distinct from each other, distinct from Koger . . . , and distinct from non-owner George." He noted that despite the Court's holding and instructions, defendants maintained on remand that KDS and KPS lacked any value, and "rebuffed" a "post-remand invitation . . . to consider another expert." The judge accepted, without further analysis, the "coherent and convincing and unrebutted evidence of value put [forth] at the trial by [Klein]."

"The findings of the trial court are critical[,] as the valuation of closely-held corporations is inherently fact-based." Balsamides, 160 N.J. at 368 (citing Rev. Rul. 59-60). Valuation in such cases "is not an exact science," and "[t]here is no right answer." Ibid. Our deferential standard of review that applies to factual findings by a judge in a non-jury trial "is particularly significant in valuation disputes, which frequently become battles between experts." Ibid. (citation omitted). However, "we need not give deference to the trial judge's determinations of what discounts or premiums the determination of fair value may include, or must exclude, since they are questions of law." Casey v.

Brennan, 344 N.J. Super. 83, 110 (App. Div. 2001), aff'd, 173 N.J. 177 (2002) (citing Balsamides, 160 N.J. at 372–73); see also Denike v. Cupo, 394 N.J. Super. 357, 382 (App. Div. 2007) (recognizing de novo standard of review regarding "what standards of value are permissible to consider" in valuing an LLC (citing Casey, 344 N.J. Super. at 113), rev'd on other grounds, 196 N.J. 502 (2008)).

When valuing a closely held corporation, "[t]he goal is to arrive at a fair market value for a stock for which there is no market." Bowen v. Bowen, 96 N.J. 36, 44 (1984).[16] Although "[n]o general formula may be given that is applicable to the many different valuation situations[,]" the IRS recommends that "all available financial data, as well as all relevant factors affecting the fair market value, should be considered." Ibid. (first alteration in original) (quoting Rev. Rul. 59-60). Those factors include "the history of the firm, the nature of the company, the outlook for the industry, the book value of the stock, the size of the block to be valued, the earnings and dividend-paying capacities of the company, and the existence of goodwill or other intangible assets." Ibid. Additionally, "[t]he very nature of the term 'fair value' suggests that courts must

---

[16] Although as the Court explained in Balsamides, the term "fair value" that applies to a court-ordered voluntary buyout pursuant to N.J.S.A. 14A:12-7(8)(c), "is not synonymous with fair market value." 160 N.J. at 374.

A-0495-16T2

take fairness and equity into account . . . ." Lawson Mardon Wheaton, Inc. v. Smith, 160 N.J. 383, 400 (1999).

Although expert testimony as to valuation is appropriate, the judge has discretion to reject the expert's opinion, even if it is the only expert evidence offered at trial. See Torres, 342 N.J. Super. at 431 (holding that trial judge has discretion to reject expert valuation of corporate stock, even when it is only expert evidence presented at trial). Accordingly, even properly admitted expert valuation testimony is subject to the factfinder's analysis based on the methods and assumptions used by the expert. See Bowen, 96 N.J. at 49–50 (in divorce case, holding that accountant expert's valuation of stock in closely held corporation was admissible but entitled to minimal weight, because expert offered no basis in generally-accepted accounting principles).

Defendants argue the judge erred by failing to provide any analysis regarding the methods Klein employed in valuing the two companies, including the criticisms of Klein's method noted by defendants' expert at trial, and the overall fairness of Klein's valuation. Robert counters by arguing that the judge provided defendants with an opportunity to present competing valuations, but they chose not to do so. We conclude, however, that by simply accepting Klein's opinions, which he implicitly rejected at trial, without any considered

41

explanation for their acceptance on remand, the judge failed to reach "a reasoned, just and factually supported conclusion[,]" by "weigh[ing] and evaluat[ing] the experts' opinions, including their credibility[.]" Pansini Custom Design Assocs., LLC v. City of Ocean City, 407 N.J. Super. 137, 144 (App. Div. 2009).

The lack of any analysis is especially problematic in light of the testimony of Martin A. Schmidt, the defense expert at trial. Schmidt asserted that Klein failed to account for the impact that Koger's support, infrastructure, and goodwill had on the value he attached to Koger, KDS and KPS. In his testimony, Klein admitted a lack of knowledge regarding the licensing agreements in place between Koger and the two companies. In his decision following trial, the judge obviously credited the import of Schmidt's testimony to some degree, because he concluded that KDS and KPS lacked any independent value and were totally dependent on Koger.

Although he valued all the Koger entities as one, Schmidt justified application of a marketability discount to their value.[17] In Balsamides, the Court

---

[17] At trial, plaintiff's counsel objected to Schmidt's explanation, arguing that under Balsamides, a marketability discount was inapplicable to the buyout ordered in an oppressed shareholder action. Ironically, following remand, with definitive rulings from this court and the Supreme Court that there was no

held that trial courts must decide whether to apply a marketability discount to determine the value of shares in a closely-held corporation and "must take into account what is fair and equitable." 160 N.J. at 377. As the Court explained, "A minority discount adjusts for lack of control over the business entity, while a marketability discount adjusts for a lack of liquidity in one's interest in an entity." Id. at 373. The Court recognized that while "marketability discounts generally should not be applied in determining the 'fair value' of a dissenting shareholder's stock in an appraisal action[,] . . . there may be situations where equity compels another result." Id. at 376 (citing Lawson Mardon Wheaton, 160 N.J. at 402).

Citing N.J.S.A. 14A:12-7(1)(c), the Court also said, "[I]n deciding whether to apply a marketability discount to determine the 'fair value' of shares of a shareholder forced to sell his stock in a judicially ordered buy-out[, courts] must take into account what is fair and equitable." Id. at 377. The Court explained:

> It is important to note the distinction between applying a discount at the corporate level to one or more of the values initially determined in valuing the entire corporation, as opposed to applying a discount at the shareholder level after the corporation has been valued.

shareholder oppression, that objection, if it had merit at the time, lacks merit now.

43

> Discounting at the corporate level may be entirely appropriate if it is generally accepted in the financial community in valuing businesses.
>
> [Id. at 373–74 (quoting 1 John MacKay II, New Jersey Business Corporations, § 9-10(c)(2), n. 426 (citations omitted)).]

On remand, the court failed to address the issue at all.

To be clear, while the judge should have considered Schmidt's criticisms of Klein's methods on remand, he did not err by disregarding Schmidt's proposed valuation, because Schmidt admitted that he did not treat KDS and KPS as independent, valuable corporate entities. That opinion clearly conflicts with the Court's holding that KDS and KPS had independent value. We also reject defendants' argument that Klein's valuation was based heavily on an asset identified by Robert — Enterprise Software — even though the judge determined after trial that it did not exist. Klein clearly testified that his valuation relied on revenue streams derived from whatever assets the companies had. Defendants' claim that Klein's valuation "heavily" relied upon a non-existent asset is specious.

We also reject Koger's attempt to present, for the first time in its appellate brief, an alternative method of valuation based upon the profits and losses of KDS and KPS from 2005 onward. Nothing in the record demonstrates Koger

urged this valuation method at trial. We refuse to address the argument for the first time on appeal. See Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973) (noting general rule that appellate courts will not address an argument presented for the first time on appeal (citing Reynolds Offset Co. v. Summer, 58 N.J. Super. 542, 548 (App. Div. 1959))).

Accordingly, and reluctantly, we remand the matter to the trial court for reconsideration of the valuation of KDS and KPS, and, in turn, the value of Robert's 50% interest in each corporation as of the valuation date. The court's conclusions following remand will also impact the amount of pre-judgment interest included in the judgment, and, while we affirm an award of pre-judgment interest, any award is subject to the discretionary guidance provided above. The court should consider all sources of information that affect the fairness and equity of Klein's suggested buyout price, including Schmidt's criticisms, the idiosyncratic relationship between Koger, KDS, and KPS, and its effect on valuation under all the circumstances of the case.

We acknowledge the court's ability to marshal additional proofs, if necessary, to determine a fair and equitable buyout amount. See Bowen, 96 N.J. at 43 (trial courts may marshal additional proofs to resolve valuation disputes); Torres, 342 N.J. Super. at 436 (when determining fair value of corporation's

shares, if parties fail to present sufficient expert testimony, trial judge must seek assistance from other sources). However, we wish to make clear that we are not ordering a new evidentiary hearing, additional experts' reports or further discovery on the issue. We leave the conduct of the remand to the sound discretion of the judge.[18]

In sum, in A-0495-16, we affirm in all respects, except as to the amount of the judgment, including the amount of pre-judgment interest. We remand to the trial court for further proceedings consistent with this opinion.

### As to 3129-16

Ras argues that the judge abused his discretion by lifting the stay on execution and summarily ordering the forfeiture of the alternative security in his February 13, 2017 order, as subsequently modified by the court's corrective February 28, 2017 order. He claims it was error for the judge to rely on the look-back accounting as justification. Ras also argues the judge wrongfully imposed a constructive trust on his income and assets. We start with some general principles.

---

[18] We recognize that the trial judge, who was also the remand judge, has since retired. However, we have full confidence that based on the trial testimony and the exhibits included in the appendices on appeal, and the exercise of his or her discretion to seek further information if necessary, the judge on remand will be able to complete this exquisitely difficult task.

"A trial court . . . is empowered to condition a stay of a judgment pending appeal by requiring an appellant to post a supersedeas bond in order to protect the respondent from the loss of the use of funds otherwise immediately due." Grow Co. v. Chokshi, 403 N.J. Super. 443, 477 (App. Div. 2008); see also R. 2:9-5(a) (providing that a stay of a judgment "in a civil action adjudicating liability for a sum of money . . . shall be stayed only upon the posting of a supersedeas bond or other form of security . . . unless the court otherwise orders after notice and on good cause shown").

The court must determine whether "good cause" exists to permit the posting of alternative security, and the burden is on the party seeking a stay supported by alternative security, "to show that the posting of a supersedeas bond in the full judgment amount would cause undue economic hardship and that in the circumstances such lesser amount or other form of security is adequate and just." R. 2:9-6(a)(2).

> In the event the court approves a form of security other than a supersedeas bond . . . , the court shall impose additional conditions on the judgment debtor to prevent the dissipation, the diminution in the aggregate value, or the diversion of the judgment debtor's assets during the appeal.
>
> [Ibid.]

The judge permitted the posting of alternative security, in part, because Ras and George claimed a lack of liquidity and inability to pay for the supersedeas bond. On the day after the judge's final decision on remand, defense counsel represented that any supersedeas bond required one-hundred percent collateralization. It was the same day that Ras and George began wiring money to Slovakia.[19] In his written decision supporting the February 13, 2017 forfeiture order, the judge explained the significance of the timing:

> The [d]efendants steadfastly concealed these transactions from late July and early August, 2016, up through January 14, 2017, in response to a court-mandated disclosure designed to ascertain, among other things, whether assets available for bonding were being moved.
>
> The stark reality is that [d]efendants had cash . . . to fully bond the [j]udgment, knew that 100% collateral would be required for bonding companies, and elected instead to transfer the monies available to secure a stay to relatives overseas. And they chose to conceal it throughout the long, protracted efforts to get alternative security in place, based upon the supposed lack of any alternative.

He concluded that defendants' actions, "while . . . convincing the court to compel [p]laintiff to accept woefully inadequate alternatives, . . . warrants the lifting of

---

[19] The judge made clear, as do we, that defense counsel had no knowledge of these events at that time.

the stay and the execution on the sole asset posted, and the real estate long ago ordered to be posted."

As we understand Ras's argument, the judge's earlier September 30, and December 13, 2016 orders anticipated forfeiture of posted assets only if it was determined after notice and hearing that there were "material misrepresentation[s]" in the ordered accounting of assets or the look back accounting. He claims that the judge held no hearing and "impose[d] punitive and draconian sanctions" on grounds other than material misrepresentations. He also argues that the judge lacked jurisdiction to order forfeiture of his Connecticut property, which was owned by a foreign limited liability company in which Ras was the sole member, and because Ras only agreed to obtain a mortgage on the property and offer its proceeds as security. We reject these contentions.

Initially, it is clear that had the judge known that George and Ras transferred an amount roughly equivalent to the judgment in the days following the final remand decision, he would have never approved, even provisionally, the alternative security arrangement. It was defendants' burden to demonstrate good cause to support the posting of alternative security pending appeal, but they repeatedly engaged in actions that tested the court's indulgence and

prolonged meaningful review of their financial circumstances. The court acted well within its discretion by ending the alternative security arrangement and ordering the forfeiture of defendants' posted security.

The judge had the authority to order further financial disclosures "to prevent the dissipation, the diminution in the aggregate value, or the diversion of the judgment debtor's assets during the appeal." R. 2:9-6(a)(2). While the financial disclosures and look-back accounting may have been accurate, the overseas transfers effectively undermined any "good cause" that supported posting the alternative security in the first place, regardless of the alleged reasons for the transfers. There were no disputed facts for the judge to adjudicate at a hearing. More importantly, neither the September 30 nor the December 13, 2016 order limited the court's inherent, equitable authority to ensure the alternative security was adequate, and to forfeit the security when a failure to do so otherwise threatened the court's ability to enforce the judgment.

As for the Connecticut property, the February 28, 2017 corrective order added it to the New Jersey properties already forfeited in the earlier order. In support of defendants' motion on short notice to post alternative security, Ras filed a certification. He certified that he was "ready and willing to pledge real property" he owned — the Connecticut property — valued at $6.75 million. The

September 2016 order that originally approved the posting of alternative security required Ras to post "[t]he deed" to the Connecticut property. Ras raised no objection on the grounds that the court lacked jurisdiction to impose such a condition because the property was in Connecticut.

The possibility of a mortgage, and the posting of its proceeds in lieu of a deed, arose later. In a December 2016 letter to the judge, the SFA outlined the jurisdictional issues and other difficulties and recommended that Ras obtain a mortgage and post the proceeds as security. At proceedings that led to the February 2017 orders, it was represented that Ras applied to refinance the Connecticut property. Ras again never argued that the court lacked jurisdiction over the asset. In fact, Ras never obtained a mortgage on the Connecticut property.[20]

We also reject the argument that the judge abused his discretion by imposing a constructive trust on Ras's income and assets. "A constructive trust is a remedial device through which the 'conscience of equity' is expressed; it

---

[20] Robert's brief asserts that the property became embroiled in Ras's subsequent divorce proceedings and remained so as of the filing of Robert's brief. He asserts that the property remains "out of the reach of execution." We express no opinion about how Robert might execute on the property if it became available and what procedure he would need to employ. We only reject the notion that the judge could not order forfeiture of the property.

A-0495-16T2

will be imposed when a person has acquired possession of or title to property under circumstances which, in good conscience, will not allow the property's retention." Thompson v. City of Atl. City, 386 N.J. Super. 359, 375–76 (App. Div. 2006) (quoting Flanigan v. Munson, 175 N.J. 597, 608 (2003)). The following two-prong test applies to determinations of whether a constructive trust is warranted: "a court must find that a 'wrongful act' caused the property to come into the hands of the recipient and that the recipient will be 'unjustly enriched' if it is not returned." Id. at 376 (quoting Flanigan, 175 N.J. at 608). The "wrongful act" necessary for imposition of a constructive trust need not be criminal; it includes, but it is not limited to, "fraud, mistake, undue influence, or breach of a confidential relationship, which has resulted in a transfer of property." D'Ippolito v. Castoro, 51 N.J. 584, 589 (1968). The circumstances in which a constructive trust may be imposed are as extensive as required to reach an equitable result. Thompson, 386 N.J. Super. at 376.

Here, the judge explained that his imposition of a constructive trust was based upon Ras's failure to disclose the transfer of assets overseas. He focused upon defendants' concealment of the transfers from the court, while at the same time claiming they lacked sufficient liquidity to post a bond. That concealment was certainly a wrongful act, as was Ras's failure to disclose in the first place

the existence of the Slovakian properties, the encumbrance of which was the alleged reason for the transfers. The transfers permitted Ras to enrich himself at the expense of his brother and delayed any possible execution on the extant judgment.

We reject Ras's argument that imposition of a constructive trust conflicts with statutory limits on post-judgment execution of wages and certain personal property. N.J.S.A. 2A:17-56(a); N.J.S.A. 2A:17-19. The court's creation of an equitable constructive trust is separate from the execution process. The arguments warrant no further discussion. R. 2:11-3(e)(1)(E).

As to A-0495-16, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion. As to A-3129-16, we affirm, subject of course to the court's ability to vacate or amend the orders under review following the remand proceedings. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION